THE PEOPLE OF THE STATE OF NEW YORK ex rel. MORTIMER D. HOWELL et al., Respondents, *v.* NATHAN C. JESSUP, Appellant.

1. PUBLIC WATERS — POWER OF SOVEREIGN TO ·AUTHORIZE OBSTRUCTION BY INDIVIDUAL. While an individual, whether riparian proprietor or not, may not appropriate lands under water to his own use or otherwise interfere with the rights belonging to the public at large of fishing or navigating the public waters, the sovereign authority may authorize the construction of bridges, piers, wharves or other obstructions in navigable waters; and when such obstructions are not obnoxious to the regulations of Congress and do not come in conflict with the paramount authority of the United States, they are not nuisances.

2. TOWN OF SOUTHAMPTON — ENGLISH CHARTERS — POWER OF THE CROWN TO GRANT NON-TIDAL WATERS. The crown of England, when the Andros and Dougan charters were granted to the town of Southampton, had authority to grant not only the land and the lands under water, but the waters as well, at and opposite Potunk Point in Great South Bay, as those waters were not navigable, within the common-law rule prevailing at the time, since, although they are used by boats, the tide does not ebb and flow there.

3. SOVEREIGNTY OF TOWN OVER WATERS. The Andros and Dongan charters vested in and conferred upon the trustees of the freeholders and commonalty of the town of Southampton a title and sovereignty over the waters and the lands thereunder, at and opposite Potunk Point, that enabled them to permit the doing of all things that a government may do for the benefit of its people.

4. CONFIRMATION AND CONTINUANCE OF CHARTER POWERS. The title and all rights of control granted to the trustees of the freeholders and commonalty of the town of Southampton by the English charters have been confirmed by the action of the colonial legislature, and continued by the several State Constitutions.

5. POWER OF TOWN TO AUTHORIZE CONSTRUCTION OF BRIDGE. The town of Southampton had power, in June, 1888, to authorize a riparian proprietor to construct and maintain, over and on the waters and land under water at and opposite Potunk Point, in Great South Bay, such a bridge as the state might have authorized had it, instead of the town, succeeded to the English sovereign's title and control over those waters, namely, a bridge which is not an unreasonable obstruction to navigation.

*People ex rel. Howell* v. *Jessup*, 28 App. Div. 524, reversed.

(Argued June 20, 1899; decided October 3, 1899.)

APPEAL from a judgment of the Appellate Division of the Supreme Court in the second judicial department, entered upon an order made April 26, 1898, affirming a judgment in favor of plaintiff entered upon a decision of the court on trial at Special Term.

This action was brought to restrain the defendant from maintaining, and to compel him to remove, a bridge constructed by him over the waters of the Great South Bay, near the village of Westhampton Beach, Long Island.

The facts, so far as material, are stated in the opinion

*David B. Hill* and *Charles M. Stafford* for appellant. The town of Southampton under the Andros and Dongan royal charters had lawful power to authorize the construction of the bridge. (*Town of Southampton* v. *M. B. O. Co.*, 116 N. Y. 1; *Lowndes* v. *Huntington*, 153 U. S. 1; *Brookhaven* v. *Strong*, 60 N. Y. 56; *Robins* v. *Ackerly*, 91 N. Y. 98; *Hand* v. *Newton*, 92 N. Y. 88; *Mayor of N. Y.* v. *Hart*, 95 N. Y. 450; *Matter of Sterling*, 9 Misc. Rep. 226; Story on Const. 1, 136; Angell on Watercourses [5th ed.], § 543; *Ex parte Jennings*, 6 Cow. 518; *People* v. *Tibbetts*, 19 N. Y. 523; *Hooker* v. *Cummings*, 20 Johns. 90.) The waters in question over which the defendant's bridge was constructed are not "navigable waters," within the meaning of the law. (16 Am. & Eng. Ency. of Law, 236, 241; *Israel* v. *M. R. Co.*, 158 N. Y. 625; *Burrows* v. *Whitwan*, 59 Mich. 279.) The state cannot cause the removal of the defendant's bridge, as the structure is not an unreasonable obstruction to navigation. (*C. B. Co.* v. *Paige*, 83 N. Y. 178; *D. & H. C. Co.* v. *Lawrence*, 2 Hun, 163; L. 1894, ch. 317, §§ 70, 71; *People* v. *Schermerhorn*, 19 Barb. 541; *Frytag* v. *Power*, 1 Whart. 536.) The Special Term having found that the waters in question are "the navigable waters of the United States" within the meaning of the law, and the United States having assumed control and jurisdiction thereof, under the provisions of the River and Harbor Act of September 19, 1890, it follows that the state of New York

cannot maintain this action. (*Gilman* v. *Philadelphia*, 3 Wall. 713; *State of Penn.* v. *W. B. Co.*, 13 How. [U. S.] 557; *Bridge Co.* v. *U. S.*, 105 U. S. 470; *People ex rel.* v. *Kelly*, 76 N. Y. 475; 3 Wall. 713; *Miller* v. *Mayor, etc.*, 13 Blatch. 469; *South Carolina* v. *Georgia*, 93 U. S. 4.)

*Timothy M. Griffing* for respondents. The findings of fact and conclusions of law submitted by the defendant cannot avail the appellant. (Code Civ. Pro. § 1023; *Palmer* v. *P. Ins. Co.*, 22 Hun, 225.) Neither the Andros patent nor the Dongan patent conferred upon the town of Southampton sovereignty over navigable waters within the town or authority to limit or control the right of navigation therein. (*Smith* v. *City of Rochester*, 92 N. Y. 463.) The waters over which the defendant's bridge was constructed are navigable. (Gould on Waters [2d ed.], § 86.) The courts can order the removal of defendant's bridge as an obstruction to navigation. (Wood on Nuisances, § 478; *F. P. B. Co.* v. *Smith*, 30 N. Y. 44; Gould on Waters, § 139; *People* v. *Vanderbilt*, 26 N. Y. 287; 28 N. Y. 396; *Blanchard* v. *W. U. T. Co.*, 60 N. Y. 513.) The authority of the United States over the waters of the Great South Bay or over this bridge is not exclusive. (*Leon* v. *Galcerian*, 11 Wall. 185; *Schoonmaker* v. *Gilmore*, 102 U. S. 118.)

Parker, Ch. J.   Great South bay stretches its way along the south side of Long Island for a distance of about forty miles, separated from the ocean only by a narrow sand spit or beach, varying in width from a few hundred yards to half a mile, except at Fire Island, where there is an inlet through which the waters of the ocean flow and ebb to and from the bay; craft, employed both for pleasure and for trade, have ploughed its waters for many years, although there are, of course, very many small arms or bays, as well as what are termed meadows, where it is not practicable to sail even the smallest vessels.

The defendant has owned for some time certain premises on the north side of the bay called Potunk Point; he also

owned the beach in front of this piece of land, which separated the bay from the ocean. Between Potunk Point and the beach is a distance of between three and four hundred feet; the depth of the water generally is not given, but some idea of it may be formed from the fact that the relator, who undertook to show that navigation was interfered with by the erection of a structure, of which we shall hereafter speak, only claimed the channel to be of a width of from fifty to seventy-five feet, and while there is no finding as to its depth, the relator testified that it is " just deep enough to float a boat about eighteen inches ;" other witnesses thought it was from two to four and a half feet deep.

The defendant, desiring for the convenience of summer guests, to connect the beach with his property on the other side of the bay by a bridge and a road built on piles, made application to the trustees of the freeholders and commonalty of the town of Southampton for authority to make such construction ; this procedure was in accordance with the custom which had been in vogue in the town of Southampton for much more than a century. The trustees, claiming the right to do so, had for even a much longer period of time leased the fisheries to particular persons, generally on condition that the fish be sold only to inhabitants of the town ; prohibited the taking of fish, clams and oysters during certain periods of the year; enforced such prohibitions by penalties ; leased lands under water for oyster planting, agreeing to indemnify and defend the lessees against assertion of hostile rights in the leased property ; sold the seaweed from the beaches ; given consents to the erection of wharves and docks, and regulated the use thereof. (*Town of Southampton* v. *Mecox Bay Oyster Co.*, 116 N. Y. 1–16.) Upon receipt of this defendant's application a notice was given by the trustees to the freeholders of the town advising them of the application and appointing the time and place for its consideration. On that day freeholders numbering from one hundred to one hundred and fifty appeared and examined the situation, after which the question of whether or not the application should be granted

was submitted to a rising vote.    Nearly every person present
voted in favor of granting the application.    When the vote
of those opposed was called for, only one person stood up,
and he is a relator in this action.    Thereupon, and on the
second day of June, 1888, the trustees of the freeholders
and commonalty of the town of Southampton passed a reso-
lution, of which the following is a copy : " Resolved, That
Nathan C. Jessup be and is hereby given liberty to make
a roadway and to erect a bridge across the Great South Bay,
commencing at the south point of Potunk Neck, thence run-
ning southerly to the beach, the said bridge to be a drawbridge
of a width of not less than twenty feet, the height above the
meadow three feet, and the draw to be twenty feet wide ; and
the said Nathan C. Jessup shall not cause any unnecessary
delay to those navigating the waters of the bay."    Relying
upon the sufficiency of the consent the defendant proceeded
to make the roadway and construct the bridge, as by the reso-
lution he was authorized to do, and no question is made but
that he strictly complied with its directions.    Nor is it pre-
tended that he made an unreasonable use of the drawbridge
by keeping it closed when he was not using it, thus obstruct-
ing the passage through of small pleasure sailing boats, which
make the most frequent use of the waters at this point.    On
the contrary, it appears that the drawbridge has always been
left open, except while being actually used by the defendant
for crossing purposes.    Indeed, one of the engineers con-
nected with the war department (Major Adams) testified that
he had made an official examination of the waters and the
bridge at Potunk Point and had caused a map thereof to be
made, and had made a report thereon to the secretary of war,
and as the result of such official examination he stated that in
his opinion the bridge as erected was not an unreasonable
obstruction to navigation.    His view was fully concurred in
by Col. Roberts, who testified that he had made an examina-
tion of the bridge under the direction of the secretary of war.
And the learned trial judge, being asked to find by the defend-
ant " that said bridge so erected is no unreasonable obstruction

to navigation," said: "Found, if bridge constructed by lawful authority," meaning thereby, as we understand the finding, that if the construction had been duly authorized it could not be condemned as an unreasonable obstruction to navigation; but if the construction was without authority, then the defendant was not entitled to the finding, for the reason that any attempt on the part of a riparian proprietor to appropriate to his own use the lands under water in front of his premises constitutes a purpresture, which is defined to be an invasion of the soil while the same remains in the People and may be removed at their suit. (*Knickerbocker Ice Co.* v. *Shultz*, 116 N. Y. 383.) And, if the invasion amounts to an interference with the common or public right to navigate the waters, it constitutes a nuisance that may be abated at the instance of the People, whether it can be shown to produce any injury or not. (*People* v. *Vanderbilt*, 26 N. Y. 287.) But while an individual, whether riparian proprietor or not, may not appropriate lands under water to his own use or otherwise interfere with the rights belonging to the public at large of fishing in or navigating the public waters, the sovereign authority may authorize the construction of bridges, piers, wharves or other obstructions in navigable waters, and when such obstructions are not obnoxious to the regulations of Congress and do not come in conflict with the paramount authority of the United States, they are not nuisances. (*Kerr* v. *West Shore R. R. Co.*, 127 N. Y. 269.) So had the title to the lands under water and the sovereignty of the waters at Potunk Point been in the state, subject only to the paramount authority of the United States and it had granted the authority to make this construction, the validity of its grant could not have been challenged.

The question of the power of the sovereign holding in trust for the People the navigable waters to partially diminish the navigability of such waters has been long settled. Abundant illustration of the exercise of the power may be found in the grants of lands under water in the Hudson river to the Hudson River and the West Shore railroad companies by which

bays or arms, larger in area and of deeper water than the one in question, have been rendered inaccessible by boats of any kind from the main stream except through a drawbridge.

In *Kerr's Case* (*supra*) the plaintiff was an owner of lands abutting on the Hudson river and had a grant of lands under water; so much whereof as was needed by the defendant for its roadbed was acquired by condemnation proceedings. Prior to the construction of the road there were two small docks on plaintiff's land, at which vessels landed for freight and passengers, but these docks were within the strip of land acquired by the railroad company. There was also a dock on a small bay near the mouth of a creek, where sand was shipped upon both scows and sail vessels. The railroad crossed this bay outside of the land under water granted to the plaintiff, and upon a bridge, which, opposite the mouth of the creek, was four feet above high water. In an action to compel the defendant either to restore the way leading to the docks, or to construct a drawbridge so as to give vessels access to the dock in the bay, the defendant had judgment, the principle upon which it was rested in this court being that the legislature has power to grant the exclusive privilege in tide water, provided the grant does not trench upon the powers granted to Congress, and that this power carries with it as an incident to it, the right to partially hinder navigation by authorizing the construction of such docks, piers and approaches as are within the demands of commerce, and to which navigation is to a certain extent subject. In the opinion may be found a number of citations where the same principle has been applied.

We see then that if the state had been the sovereign and had granted to the defendant the right to make this construction, it would have been within its authority and valid, and at the same time the reason for the finding we last referred to is apparent. The court was of the opinion that the state and the state only could grant authority to do that which the defendant did, and hence it found that the use was not unreasonable provided the defendant had the authority, which, however,

from its judgment, as well as the reasons given for it, it is quite clear the court believed he did not have.

This brings us to the real question involved, and that is whether the town of Southampton is the sovereign as to the lands under water and has control of the waters at this point, for it alone gave the authority to the defendant.

We have seen that where the state is the sovereign it has power to grant such a construction in and upon lands under water, and if we stop a moment to consider the reason for it, we will be aided in determining later on whether sovereignty as to the *locus in quo* resided in the trustees and freeholders of the town of Southampton at the time they passed the resolution authorizing the construction of the pier and bridge.

The English possessions in America were not claimed by right of conquest, but by right of discovery; for, according to the principles of international law as understood by the then civilized powers of Europe, the Indian tribes in the new world were regarded as mere temporary occupants of the soil, and the absolute rights of property and dominion were held to belong to the European nation by which any particular portion of the country was first discovered. Discoveries made by persons acting under the authority of the government were for the benefit of the nation, and according to the principles of the British Constitution, all lands embraced in such discovery, including lands under water, and inland waters, were vested in the crown as representing the nation. (*Johnson* v. *M'Intosh*, 8 Wheaton, 595; *Martin* v. *Waddell*, 16 Peters, 367.) The king could grant these lands and inlets, except as to the soil under navigable rivers or arms of the sea where the tide regularly ebbs and flows, including the shore or bank to high-water mark. This right by common law he held not for his own benefit, but for the benefit of his subjects at large, who were entitled to the free use of the sea and all tide waters for the purposes of navigation and fishing, subject to such regulations and restrictions as the crown and Parliament might prescribe. (*Gould* v. *Hudson River R. R. Co.*, 6 N. Y. 522.) It is true that the court in *Martin* v. *Waddell* (*supra*)

declined to pass upon the question whether, since Magna Charta, the king could grant portions of the soil covered by the navigable waters of the kingdom, so as to give an immediate and exclusive right of fishery within the limits of the grant. But the learned justice who delivered the opinion of the court said : " The question must be regarded as settled in England, against the right of the king, since Magna Charta, to make such a grant."

The rule of the English decisions has, we think, been generally accepted by the later decisions in this country, but the question is not of moment on this review. When the revolution took place the people of each state became themselves sovereign, and in that character held the absolute right to all the navigable waters and the soils under them that were previously thereto held by the English government in trust for the People, and generally speaking, therefore, it is true, as has often been said by the courts of this and other states, that the state has succeeded to all the rights of both crown and Parliament in the navigable waters and the soil under them. (*Langdon* v. *Mayor*, *etc.*, 93 N. Y. 129.) And the state, through the medium of the legislature, may exercise all the powers which, previous to the revolution, could have been exercised, either by the king alone, or by him in conjunction with his Parliament, subject only to those restrictions which have been imposed by the Constitution of this state or of the United States. (*People* v. *N. Y. & S. I. Ferry Co.*, 68 N. Y. 71 ; *Knickerbocker Ice Co.* v. *Shultz*, 116 N. Y. 382.)

But the claim in this action is that the title to the land under water and the control of the waters at this point were not vested in the English government in trust for the People at the time of the revolution, but instead were vested in the trustees of the freeholders and the commonalty of the town of Southampton by charters granted nearly one hundred years before the war of the revolution, and that such charters have not only not been interfered with, but have been protected by the Constitution of this state, so that the sovereignty conferred by the charters has been continued down to the present

time.   The town of Southampton had a distinct political existence, and was possessed of separate property rights long before the creation of the state government.   On November 1st, 1676, Edmund Andros, governor-general under his Royal Highness, James, duke of York and Albany, etc., by letters patent of that date, under the seal of the province of New York and the commission and authority given him by his royal highness, granted unto John Topping and others, for themselves and their associates, the freeholders and inhab-itants of Southampton, certain tracts of lands, islands, waters, etc., conceded to embrace, among other things, that portion of the lands and water of the Great South Bay in question on this review.   By said letters patent it was declared that said tract of lands should belong to said town, with "all rivers, lakes, waters, hawking, hunting and fowling, and all heredita-ments thereto belonging; to have and to hold all and singular the said premises, with their and every of their appurtenances, and of every part and parcel thereof, to the said patentees and their associates forever."   And there was confirmed and granted unto said patentees " ' * * * all the privileges and immu-nities belonging to a town within this government."

About ten years later, and on December 6th, 1686, in the second year of the reign of King James II, Thomas Dongan, then governor of the province of New York, by letters patent of that date, granted to the trustees of the freeholders and commonalty of the town of Southampton a confirmatory charter or patent of the premises before mentioned, creating the town a body corporate and politic, and confirming said premises to the said town, "with all * * * swamps, rivers, riverlets, waters, lakes, ponds, brooks, streams, beaches * * * creeks, harbors, highways and easements, fishing, and all other franchises, profits, etc., to said premises belonging, or in anywise appertaining or therewith used, occupied, accepted, reputed or taken to belong or in anywise to appertain to all intents, purposes and constructions whatsoever."   By said let-ters patent it was also declared that said trustees " be and shall be forever in future time persons able and capable in

law to have, perceive, receive and possess not only all and sin-
gular the premises, but other * * * privileges, jurisdic-
tions, franchises, and hereditaments of whatsoever kind or
species * * * in full forever." These letters patent also
contained provisions conferring the power of management
of the premises upon the trustees of the town, who were
authorized to perform such acts and to make such orders as
they might see fit, so that the same should in nowise be
repugnant to the laws of England; and further, said letters
declared that said trustees should "have, hold, use and enjoy,
and they shall and may forever have, use, hold and enjoy,
all the liberties, authorities, customs, orders, ordinances, fran-
chises * * * without let or hindrance of any person or
persons whatsoever." The charter contained no reservation
whatever, except that of gold and silver mines.

In construing a charter containing similar provisions, Chief
Justice TANEY said: "It is not a deed conveying private prop-
erty, to be interpreted by the rules applicable to cases of that
description. It was an instrument upon which was to be
founded the institutions of a great political community; and
in that light it should be regarded and construed." Were
there no authorities in existence commanding such a decision,
we could, guided by this rule alone, quite readily reach the
conclusion that the letters patent were broad enough in terms
to grant to the trustees of the freeholders and commonalty of
the town of Southampton not only lands under the waters,
but the sovereignty over the waters itself for the benefit
of the freeholders and inhabitants of the town, to such
extent at least as would enable them to authorize such a con-
struction as that involved in this action. At the time of the
granting of the several letters patent to which reference
has been made, the English government was possessed of all
the lands embraced within the description contained in the let-
ters patent, the title thereto being vested in the king, in trust
nevertheless for the people. Whether he had the power to
grant all of the lands under water, together with the waters
thereon, depended upon whether any portion of the waters

were in law navigable at the time of making the grant. On our way to this point, and while considering the powers of the crown, reference was made to the fact that at the common law, while the king owned all the soil under all the navigable rivers or arms of the sea, where the tide regularly ebbed and flowed, he held them nevertheless in trust for the benefit of his subjects at large, who were entitled to their free use for the purposes of navigation and fishing, the test of navigability being the ebbing and flowing of the tide. (*Gould* v. *H. R. R. R. Co.*, *supra.*)

The question was not up in that case for decision, but it was in *Ex parte Jennings* (6 Cowen, 518), and *People* v. *Tibbetts* (19 N. Y. 523). In the former case the court said: "By the term navigable river the law does not mean such as is navigable in common parlance. The smallest creek may be so to a certain extent, as well as the largest river, without being legally a navigable stream. The term has in law a technical meaning; and applies to all streams, rivers or arms of the sea, where the tide ebbs and flows." This court in *Tibbetts'* case decided, after a careful consideration of the subject, that the ebb and flow of the tide was the common-law test of the navigability of waters. That there has been in this country some modification of the rule by which the navigability of waters is tested is true (*Roberts* v. *Baumgarten*, 110 N. Y. 380), but this is no occasion for us to consider the changes in the rule; it is sufficient for our present investigation that we are advised that, at the time this grant was made, the settled rule of the common law by which to determine whether or not waters were navigable, was tested by the question: Does the tide there ebb and flow?

Now the learned trial justice found the fact to be that "there is no flow and reflow of the tide at the place where the defendant's bridge is located." And another finding is as follows: "There is no ebb and flow of the tide, no continuous highway through the waters and various bays by natural channels east of defendant's bridge." It is true that the court also found that the waters were navigable at this point, but

that finding has no bearing whatever upon the question whether or not such waters were in law navigable waters at the time the patents were granted. Whether they were at that time navigable waters under the common law of England, must be determined by the fact whether there was an ebb and flow of the tide, and that is conclusively answered by the finding of the court that the tide did not ebb and flow where the bridge and pier were constructed, nor east of it. It was, therefore, within the power of the crown to grant the lands under water, and the waters as well, at the time of the making of the grants in 1666 and 1686.

Having ascertained in the course of this digression, that the power resided in the crown to grant the lands under water, and the control of the waters at this point, we recur again to the Andros and Dongan charters for the purpose of ascertaining what was intended to, and did, pass by them; for the validity of these instruments is not only unchallenged, but is established by previous decisions of this court, and is affirmed, as we shall later show, by legislation of the colony and the state. Reading the charters in the light of the law at the period of their execution, we find that a sovereign in whom was vested the title to certain lands under water and the waters above them, now the subject of controversy, with the absolute right of disposition thereof, desiring to create a body corporate and politic for the benefit of such of his subjects as were or should become interested therein, did, by the Andros and Dongan charters, create a body corporate and politic, vesting in the trustees of the freeholders and commonalty of a town, which was named Southampton, not only all the lands, but all the "swamps, rivers, riverlets, waters, lakes, ponds, brooks, streams, beaches, creeks, harbors, highways, easements, fishing and all other franchises and profits." So, in express terms, and by the use of words about the meaning of which there can be no doubt, the sovereign granted to the trustees for the freeholders and commonalty of the town all the waters within the boundaries contained in the grant, as well as the title to the lands under water and all franchises relating

thereto.   From the sovereign's point of view, as well as from that of the public, this action was politic ; for it lodged in the trustees of the town the authority to do all those things which would inure to the benefit of the inhabitants of the town, and at the same time it tended to stimulate them to think out such a course of action as should best employ the waters for the public good.   To that end the trustees were invested with the power of management and authorized to perform such acts and make such orders, not repugnant. to the laws of England, as they might see fit.   But these charters are not strangers to this court, for as to these and similar charters it has already been decided : *First,* that they conferred upon the town, in its corporate capacity, the legal title to the uplands, and also to the lands under water embraced in the grants.   (*Town of Southampton* v. *Mecox Bay Oyster Co.,* 116 N. Y. 1 ; *Lowndes* v. *Huntington,* 153 U. S. 1.)   *Second,* that they granted to the town the exclusive right to control the fishing in such waters. (*Brookhaven* v. *Strong,* 60 N. Y. 56 ; *Robins* v. *Ackerly,* 91 N. Y. 98 ; *Hand* v. *Newton,* 92 N. Y. 88.)   The *Mecox Bay Case (supra)* was an action in ejectment, brought by the town of Southampton, to recover lands under the waters of the Mecox bay.   The plaintiff's claim of title to the lands was founded upon the same charters as those upon which the freeholders reposed in voting to authorize this defendant to construct the pier and bridge, and upon which the trustees relied in passing the resolution giving him authority to make such construction.   The plaintiff had judgment, which was affirmed in this court, it being held that the title to the lands under the water itself absolutely vested in the town under the Andros charter, which was confirmed by the Dongan charter, and that " the absolute control and management thereof has been exercised by the trustees from the Dongan charter to the present time."   The court further on referred to the two acts of the legislature that related to these grants, the first act being passed April 13th, 1818 (Laws 1818, chap. 155), and the second in the year 1831 (Laws of 1831, chap. 283), the former of which the court concluded was passed by consent of the interested parties, and

the latter at the request of the inhabitants of the town, which
provided in part that the trustees of the town "should have
the 'sole control' and management of the fisheries, sea weed,
waters and the production of the waters of the town granted
by the Dongan charter, except so far as they had been changed
and altered by the Act of 1818," following which the court
said : " We have, then, not only an uninterrupted user, under
the patents, by the town and its inhabitants for over two cen-
turies recognizing the right of the town to *control and man-
age the waters* of the town and their productions, and to exer-
cise over them all the rights which flow from ownership and
possession of title, but the distinct recognition by the legisla-
ture of the state on two occasions that the title thereto was
in the town." *Lowndes* v. *Huntington* (*supra*) was an
action in ejectment brought by the town to recover of
Lowndes the possession of certain lands under water in
Huntington bay, whereon Lowndes had planted oysters. The
charters relied on in that case to establish ownership to the
lands under water in the town, consisted of a charter by Gov-
ernor-General Andros in 1666, affirmed by a charter executed
by Governor-General Dongan in 1688, and again affirmed by
Governor-General Fletcher in 1694. The charters were sub-
stantially in the same form as the charters in this case. It
was contended in the Supreme Court, as it had been in the
courts of this state, that the *locus in quo* was not included
within the lands under water granted by the colonial charters,
and it was urged that the words describing the water designed
to be conveyed by the charters, were intended to convey
strictly the interior waters. It was further insisted by the
plaintiff in error that the act of cession by the legislature of
the lands under water in Huntington bay did not confer upon
the town such a title as to enable it to maintain an action in
ejectment. The court reached the conclusion that the lands
were granted by the Andros and Dongan charters to the
town, and also said in effect that in any event the right of the
plaintiff to succeed in the action was clear, for if such lands
had not been included in the colonial grants to the town of

Huntington, they were embraced within the act by which the state ceded the right, title and interest of the state in such lands to the town.

In *Robins* v. *Ackerly* (91 N. Y. 98) it was held that Northport harbor was included in the Andros grant to the town of Huntington in 1666, and hence that the town had the authority to lease to the plaintiff, Robins, a parcel of lands under water in said harbor " to be exclusively used and enjoyed " by him " in the business of planting, growing and cultivating oysters thereon ; " and the judgment awarding damages against the defendant for trespassing upon such lands was affirmed.

*Hand* v. *Newton* (92 N. Y. 88) arose under the same charter and presented a similar question to the one in *Robins'* case and with the same result.

The learned counsel for the respondent has not brought to our attention any case in which the courts have decided any proposition in conflict with the decisions above referred to. In all of the various opinions upon the general subject, he has been able to find only one expression that he deems helpful to his view, and that is in the opinion of Chief Judge Church in *Trustees of Brookhaven* v. *Strong* (60 N. Y. 56). That action was brought by the town to recover damages for the taking of oysters from Great South Bay. The judgment entered on a verdict in favor of the plaintiff by direction of the court was affirmed in this court, where it was held that the grant by the colonial governor in 1666, by letters patent of a tract described by metes and bounds, with " all rivers, waters, beaches, creeks, harbors, fishing " and all other " franchises to said tract appertaining," granted to the patentees the lands under that portion of the bay included within its bounds, with the exclusive right of fishing therein. In the course of the opinion the court discussed the right of fishing and its two divisions — the right common to all and the right vested in one or a few individuals. In the development of the argument it was considered whether the ownership of the soil was material in determining that question, and then followed a statement of the rule as to fresh water rivers,

after which the court continued : "The rule of ownership bordering on navigable waters, that is where the tide ebbs and flows, is different. The title of the adjoining owner extends only to high-water mark; but if the title to the soil under water is obtained, there is no reason why the same right of fishery would not attach as to fresh waters, subject of course to the superior public right of navigation." That this was merely a casual recognition of the unquestioned general rule that in navigable waters the right of navigation is superior, is apparent not only from the connection in which the phrase appears, but also from the fact that the question was not up for decision or decided, nor was the subject again referred to. If the remark meant more than we have said, and had the force and effect of a decision of some question presented, we should attempt to show that the fact that in that case the tide ebbed and flowed, while in this one it did not, presents a very different legal situation. In the former case the king had not the right to grant sovereignty over the waters without the aid of Parliament, or at least of the colonial legislature, while in the latter he had. But it was not decided in the *Brookhaven* case whether the town acquired sovereignty over the navigable waters within its boundaries through its charters and subsequent legislation, and we express no opinion on the subject.

The result of our investigation is that we conclude that the crown had authority to grant not only the land and the lands under the water, but the waters as well at this point, and that the title and the sovereignty over such water and the lands thereunder was by the Andros and Dongan charters vested in and conferred upon the trustees for the freeholders and commonalty of the town of Southampton, a sovereignty that enabled them to permit the doing of all things that a government may do for the benefit of its people.

Subsequently the validity of these charters was affirmed by legislation of the colony ; thus on May 6th, 1691, the colonial legislature passed an act entitled : "An Act for the Setling, Quieting and Confirming unto the Cities, Towns, Mannors

34

266    People ex rel. Howell *v.* Jessup.    [Oct.,

Opinion of the Court, per Parker, Ch. J.    [Vol. 160.

and ffreeholders within this Province, their several Grants, Pattents and Rights Respectively." The act, after a recital of the reasons for its passage, enacted in the first provision as follows : " That all the Charters, Pattents, Grants, made given and granted, and well and truely executed under the seale of this Province, Constituted and authorized by their late and present Majtys the Kings of England, and Registred in the Secretaryes office, unto the severall and respective Corporations of Bodys politick of the Cittys Towns and Mannors, and alsoe to the severall and respective ffreeholders within this province, are and shall for ever be deemed, esteemed and reputed good and effectual, Charters Patents and grants Authentick in the Law against their Majesties their heires and Successors for ever, notwithstanding of the want of formes in the Law or the Nonfeazance of any right priviledge or Custome which ought to have been done heretofore by the Constitutions and Directions contained in the respective Charters, pattents and grants aforesaid." And in the second provision it was provided, " And be it further enacted by the Authority aforesaid, That all the Chartters Pattents grants, made given and granted as aforesaid, unto all and every the severall and respective Corporations, or bodys politick of the Cittys Towns and mannors and their successors, and alsoe unto all and every the respective ffreeholders, their heires and assignes forever ; within this Province, Are to all intents and purposes whatsoever hereby, ratified and confirmed." (Colonial Laws of New York, vol. 1, pp. 224, 225.)

The acts of the colonial legislature were expressly validated and continued by the respective Constitutions of 1777, 1821, 1846 and 1894. (*Trustees of Brookhaven* v. *Strong,* 60 N. Y. 56, 70.) The portion of the Constitution referred to reads as follows : " Such parts of the common law, and of the acts of the Legislature of the Colony of New York, as together did form the law of the said colony, on the nineteenth day of April, one thousand seven hundred and seventy-five * * *, and such acts of the Legislature of this State as are now in force, shall be and continue the law of this State, subject to such

alterations as the Legislature shall make concerning the same."
(Constitution, art. 1, § 16.)   By the several Constitutions of
this state great care has been taken to prevent the possibility
of a claim that the Constitution affected any of the grants of
land made by authority of the king, or annulled any charters
to bodies politic made before the 14th day of October,
1775 ; indeed, the effect of the adoption of the first Con-
stitution was to confirm the grants.   (*Sage* v. *Mayor*, *etc.*,
154 N. Y. 61, 81.)   The present constitutional provision
is in effect like that which appeared in the first Constitution,
the only difference being in phraseology not affecting the
substance, and reads as follows: " All grants of land within
this state, made by the king of Great Britain, or persons
acting under his authority, after the fourteenth day of Octo-
ber, one thousand seven hundred and seventy-five, shall be
null and void ; but nothing contained in this Constitution shall
affect any grants of land within this state, made by the
authority of the said king or his predecessors, or shall annul
any charters to bodies politic and corporate, by him or them
made, before that day ; or shall affect any such grants or char-
ters since made by this state, or by persons acting under its
authority."   (Constitution, art. 1, § 17.)

The conclusion drawn by us from these enactments and pro-
visions of the organic law is that the title and all rights of
control granted to the trustees for the freeholders and com-
monalty of the town of Southampton was confirmed by the
enactment of the colonial legislature, and continued by the
provisions of the first and subsequent Constitutions, thus justi-
fying the expression of opinion on the part of the court in
the *Mecox Bay Case* (*supra*), that " the right of the town to
control and manage the waters of the town and their produc-
tions, and to exercise over them all the rights which flow from
ownership and possession of title," not only appeared from
the patents and the user thereunder by the town and its inhab-
itants for more than two centuries, but by two enactments of
the legislature it was recognized " that the title thereto was in
the town."

The statutes thus referred to were briefly mentioned by us while examining the *Mecox Bay* case, special note being made of the fact that, by the act of 1831, it was provided that the trustees of the town "should have *sole control* and management of the fisheries, sea weed, *waters* and *productions of the waters*," granted by the Dongan charter, and it is possible that, had we reached the conclusion that title and sovereignty as to so much of the water as is now in controversy were not confirmed by the colonial legislation and continued by the Constitution, we should have followed the holding of the Supreme Court of the United States in *Lowndes* v. *Huntington* (*supra*), when considering another charter and different statute, and decided that the effect of the act of 1831 was to cede the rights of the state therein to the trustees of the town. We refrain from passing on the question, however, as from our view its discussion is unnecessary at this time. If we have reasoned accurately thus far, the title to the lands under water and the right of possession and control of the waters in question were in the trustees, who had the right in their sovereign character to do in the discharge of their trust precisely what their predecessor sovereign could have done, or what the state, had it instead of the town succeeded to the title and rights of the English government, might have done, or may yet do, shall it hereafter so succeed, by an exercise of its right of eminent domain. The state, as we have already seen, may authorize such a construction in waters over which it has either retained or regained control, and it follows that the action of the town trustees conferred upon the defendant lawful authority to make the construction. The learned trial justice found the fact to be "that said bridge so erected is no unreasonable obstruction to navigation," "if bridge constructed by lawful authority."

It follows that the judgment must be reversed, and, as there is no controversy about the controlling facts and apparently no opportunity for it, the complaint should be dismissed, with costs.

All concur.

Judgment reversed, etc.