William L. Underwood, Jr., J.
The issues of fact herein having come on to be heard by the court at a Special Term held by the undersigned, without a jury, and having been tried on the 29th day of January, 1973, and this action having been finally submitted to the court for determination on the 24th day of April, 1973,1 find and decide as follows:
THE PLEADINGS
In its first cause of action, the State recites that defendant is the owner of certain real property known as 550 Dune, Westhampton, Town of Southampton, New York, west of Gunning Point, which borders on the southerly side of Moriches Bay. The State further recites that since April 1,1972, defendant has filled in his property, both above and below the high water mark of Moriches Bay, and alleges a trespass by defendant upon the theory that the area below the high water mark is not owned by the defendant, but rather, constitutes underwater land owned and held in trust by the Trustees of the Freeholders and Commonalty of the Town of Southampton (the Trustees) for the benefit of the People under the Dongan Patent, issued in 1686.
*788 In its second cause of action, the State claims, that defendant, by filling in land below the high water mark as alleged in the first cause, has created and maintained “ an intolerable public nuisance * * * despoiling the natural economic, scenic and recreation resources of the State.”
As a third and final cause of action, the State claims “ pollution of the waters of the State,” and “ a destruction of water resources ’ ’ by the alleged filling in below the high water mark of Moriches Bay.
With respect to these causes of action, the State seeks a permanent injunction, ‘ ‘ enjoining the filling in by defendant of any land located below the high water mark of any waterway within the Town of Southampton unless a permit for such filling shall have been issued by the Trustees of the Freeholders and Commonalty of the Town of Southampton,” and an order directing defendant to remove any fill placed by him below the high water mark of Moriches Bay.
The defendant, by way of specific denials, defense, and affirmative defenses to the actions, contends in effect:
First: That the Dongan Patent pursuant to which the State claims title in the Trustees, merely confirmed title to existing lands both shore and below water, in the Trustees, and granted title to no one.
Second: That defendant’s grantor, prior to conveyance of the premises to defendant, filed a petition to register title to the lands described in the petition, in which proceedings the Attorney-General of the State of New York appeared, and a judgment of registration entered therein.
Third: That the judgment of registration is not now subject to attack by the State or any other person.
Fourth: Laches by the Trustees and the plaintiff.
Fifth: The Trustees have divested themselves of title to any portion of the defendant’s premises by specific allotments of “ meadow lots ” in the year 1712.
Sixth: That the Attorney-General, pursuant to the registration proceedings referred to under defendant’s second defense, has an obligation to defend defendant’s registered title, and not to attack it in whole or in part.
THE ISSUES AFTER TRIAL
1. In an action to enjoin a trespass, to what extent if any, does the court determine title?
2. What was the right of the State in bringing the first cause of action?
*789 3. Did the State claim that defendant filled in land beyond the metes and bounds description contained in his registered certificate of title ?
4. Did the State prove that any portion of defendant’s property, as contained and described in the registered certificate of title, had been lost to defendant by “ erosion ” or “ submergence ” prior to the filling in thereof?
5. Did the State prove a misappropriation by defendant to his own use of “land under water” or taking of soil under navigable waters where the tide regularly ebbs and flows?
6. Whether soil below water which is technically 1 ‘ navigable ” applies to marshland where a part is submerged at high tide or even at all times, or to marshland exposed at low tide and covered at high tide?
7. Did the State prove that defendant created and maintained a public nuisance as alleged in the second cause of action?
8. Did the State prove that defendant polluted the waters of the State and destroyed water resources as alleged in the third cause of action?
The court will discuss and decide these issues in the sequence presented, and will number them accordingly.
(1) Although plaintiff’s first cause takes the form of an action in equity to enjoin a trespass, it is in reality an action which requires a determination of title to the property filled in by defendant, and for the recovery of possession of real property by the plaintiff. (See, for example, Archibald v. New York Cent. & Hudson Riv. R. R. Co., 157 N. Y. 574; Mulry v. Norton, 100 N. Y. 424.)
It has been held that' equity, having taken jurisdiction of a suit to enjoin interference with property rights, may determine the question of title to the property where irremediable injury is alleged, as going to the substance of the estate. (21 Joyce, Injunctions, § 1139, subd. [a]; 1 Pomeroy, Equity Jurisprudence, § 238.)
(2) The right of the State in bringing the first cause of action rests upon the theory that navigable waters are public highways, title to which ordinarily vests in the State in trust for the use of the People. (3 Warren’s Weed, New York Real Property, § 1.04; see, also Appleby v. City of New York, 167 App. Div. 369.) It is also true, that the State has standing to enjoin any misappropriation of land under water to one’s own use, and to enjoin any nuisance or interference with the rights belonging to the public ni large “ of fishing in or navigating the public waters ” (People ex rel. Howell v. Jessup, 160 N. Y. 249, 254). *790 However, it was made clear in Jessup, that the State’s standing to sue is primarily based upon and concerned with ‘ ‘ the power of the sovereign holding in trust for the People the navigable waters to partially diminish the navigability of such waters ” (emphasis added) and that as to lands under water which are not navigable, the town has sovereignty.
In Tiffany v. Town of Oyster Bay (234 N. Y. 15, 20, 21), the court spoke in terms of private and public interests in a foreshore, or land under water, as follows: ‘ ‘ The foreshore or land under the waters of the sea and its arms, between high and low-water mark, is subject, first, to the ‘ jus publicum ’ — the right of navigation, and when the tide is out, the right of access to the water for fishing, bathing and other lawful purposes to which the right of passage over the beach may be a necessary incident * * * Such land is also subject, secondly, to the jus privatum, the rights of the owner of the foreshore, the town of Oyster Bay in this ease, which holds the land in its corporate political capacity, in trust for the public good. Its rights are general in their character, as yet not defined with accuracy by and the ownership and regulation of oyster beds and some general aid to commerce, navigation, fishing or bathing.” (Emphasis supplied.)
Since in the case at bar, the Trustees of the Freeholders and Commonalty of the Town of Southampton are not made a party to the action, this court, in determining title, shall primarily deliberate upon the jus publicum.
(3) At the commencement of the trial, and prior to the taking of any testimony, the parties stipulated to the following facts:
That the land claimed by the State is a portion of the premises described by metes and bounds contained in a certain 1950 registration judgment (which will be discussed further on), and contained within all subsequent owner’s certificates of title, including defendant’s. It was also stipulated that all of the fill referred to in the complaint is within the metes and bounds descriptions referred to.
Thus, there is no claim by the State, that defendant’s alleged trespass occurred outside of the boundary lines of his own property.
(4) The State has failed to establish that prior to the time defendant placed fill within the boundary lines of his property, that any portion of defendant’s property had been lost to him by “ erosion ” or “ submersion.”
In Mulry v. Norton (100 N. Y. 424, 433), the court said: “ It is undoubtedly true that the proprietorship may be lost by erosion or submergence. The one ‘[erosion] consisting of a gradual *791 eating away of the soil by the operation of currents or tides, and the other of its disappearance under the water and the formation of navigable body over it.” (Emphasis added.)
Further, the court said in Mulry (p. 434): “ It is not, however, every disappearance of land by erosion or submergence that destroys the title of the true owner, or enables another to acquire it, for the erosion must be accompanied by a transportation of the land beyond the owner’s boundary to effect that result, or the submergence followed by such a lapse of time as will preclude the identity of the property from being established upon its reliction. ’ ’ (Emphasis added.)
The State did not prove, nor did it ever contend, that there was a transportation of defendant’s land beyond the boundary line of defendant’s property. The only testimony by the State’s sole witness as to £ ‘ submergence ’ ’, was a daily flooding of defendant’s land by less than two feet of water. Ño disappearance of defendant’s land under navigable waters was ever testified to by the State’s witness.
Whether the flooding of land is the result of erosion, is a question of fact which must be established by the party asserting it (see Matter of City of Buffalo, 206 N. Y. 319).
In Buffalo, the court observed (p. 326): “ The land of the appellants Bowen et al. has been lost by erosion. For many years it had been completely submerged. Under the rule applicable to loss of land by erosion the state is now the owner thereof. During the years in which this change was in progress the former owners made no attempt to stay the encroachment of the water or to reclaim the lost land."
It is clear from this quotation, that loss by submergence must be accompanied by a long lapse of time. Of even greater importance, is the court’s recognition that a property owner may attempt to save his land from loss by submergence or erosion.
(5) The State’s sole witness testified that he is employed by the New York State Department of Environmental Conservation as an Associate Wildlife Biologist, and had been so employed for a period of 13 years. Of this period of employment, 11 years were spent on Long Island and he had been involved with the Long Island Wetlands Act, and the management of salt marshes and salt meadows on the shores of Long Island. His education consisted of graduation from a university, where his major subject had been in zoology, and his minor subject in botany. It was his testimony, that on January 3, 1973, at the request of the Attorney-General, he made a personal inspection of defendant’s land, and that thereafter on January 15, and 19, *792 he returned to the property with a surveyor from his Department to locate vegetation in the area. Based upon these inspections and the survey, the witness prepared a map entitled ‘ ‘ Map bf Property of Hermon L. Bishop ”, received in evidence as plaintiff’s Exhibit No. 3.
The map shows that defendant’s property abuts Moriches Bay on the north, and depicts the existence of two varieties of vegetation growing adjacent to the easterly and westerly boundaries of defendant’s property. Proceeding inland from the northerly point of the property, along the westerly boundary approximately 450 feet, the first line of vegetation depicted in the map is a plant, which in the opinion of the witness, is spartina alterniflora, more commonly known as “ cord grass ”. This plant, in order to thrive and blossom, must be within tidal range; it requires daily flooding and is generally found to exist below mean high tide, or within the prism of the tide. The second line of vegetation depicted in this map, in the opinion of the witness, consisted of spartina patens, generally found to exist above mean high tide. Between these two lines of vegetation, there exists a “transitional zone” consisting of a mixture of both the spartina alterniflora and the spartina patens, and it is within this zone that the witness fixed the plane of mean high water, or the ‘ ‘ mean high water mark. ’ ’ Samples of the vegetation were not produced.
In addition to the map, showing the plant life adjacent to, but not growing upon defendant’s property, two aerial photographs, in black and white, were introduced into evidence.
The first aerial photograph is dated May 2, 1968, and had originally been taken in color. Neither the original negative nor the color photograph itself was ever produced. The black and white photograph purports to generally encompass defendant’s property, and has a transparent overlay affixed to it bearing red and green lines, placed there by the witness a few days before the trial. These red and green lines, which the witness approximated, seek to project the existence of spartina alterniflora and spartina patens upon defendant’s property on the date the photograph was taken. Examination of the black and white photograph itself, however, although bearing some tonal variations in the area where the vegetation is alleged to exist, does not clearly demonstrate the existence of vegetation.
The second aerial photograph, dated July 28, 1972, also has an overlay attached to it bearing red and green lines placed there by the witness a few days before trial. As in the first overlay, the red and green lines seek to project the existence of the *793 spartina alternifiora and the spartina patens on defendant’s property on the date the photograph was taken. An examination of this photograph itself, reveals no significant tonal variations to the naked eye, as would indicate the existence of the vegetation alleged, in the area alleged.
There were several omissions and inconsistencies in the testimony of this witness, which in the opinion of the court greatly weakened its probative value.
First, the witness testified that his projections of vegetation on the black and white aerial photographs were based upon a color photograph taken in 1968. Then he testified that the projections were based upon tonal differences appearing on the black and white aerial photographs. Upon cross-examination he changed his testimony by stating that the projection of the two lines of vegetation was based upon the map he prepared in January of 1973.
At one point in his testimony the witness excluded the possibility of 1£ wind tides ’ ’ as having an effect on the inundation of defendant’s property, then changed his testimony by stating that £ 5 wind tides ’ ’ would affect the zone, or area of mixed vegetation, where he fixed the mean high water mark. In addition, the witness failed to examine into other factors which might affect the tidal influences in the area, and which would not result from <£ erosion” or “submergence”, to wit: the deepening of Moriches Bay for the intercoastal waterway; the digging of mosquito ditches; the man-made Quogue Canal; and the stabilization of Moriches Bay. The witness, who was perhaps an expert in zoology, was not qualified to testify as an expert on tidal action effecting inundation of defendant’s property.
At this juncture, it is appropriate to briefly discuss the case of Dolphin Lane Assoc. v. Town of Southampton (72 Misc 2d 868) upon which the State has so heavily relied in bringing this action. The portion of the Dolphin decision upon which the State bases its case, deals with a determination of the “high water mark” to delineate the plaintiff owner’s boundary line abutting ¡Shinnecock Bay. Of particuar interest in Dolphin is the discussion (p. 884) of Borax, Ltd. v. Los Angeles (296 U. S. 10), which stated that the proper determination of the location of a high water line at any given time involves the consideration £ £ of all the high waters at a particular place over a considerable period of time and that under sound astronomical theory, the period considered should cover the past 18.6 years.”
*794 In Dolphin, the court did not have before it a registered metes and bounds description as was here presented, and apparently, for lack of a better means of determination, the court relied upon botanical evidence consisting of spartina alterniflora and spartina patens which the court found (pp. 885-886) “indicative of the tidal flow for all the months of the year, over the course of several years.” Whatever these proofs were in Dolphin, this court does not find presented here.
(6) Moreover, soil below water which is “ technically navigable ” or navigable as a matter of law (see People ex rel. Howell v. Jessup, 160 N. Y. 249, supra), but not navigable in fact, does not apply to marshlands.
As stated in 28 Words and Phrases 124: ‘ ‘ The term 1 navigable waters ’ as applied to the dominion of the national and state governments over shore lands and the rights which they have or can convey, means waters which are navigable in fact and not simply tidal waters. (McGilvra v. Ross, 30 S. Ct. 27, 215 U. S. 70, 78, 54 L. Ed. 95.)
“ Marsh land exposed at low tide and covered at high tide by water to a depth enabling crafts drawing not more than 20 inches to operate thereon was not covered by ‘ navigable waters ’, as respects whether the owner had merchantable title to land. (Home Real Estate Loan and Insurance Co. v. Parmele, 197 S. E. 714, 214 N. C. 63.)
“ 1 Navigable Waters ’, the soil beneath which vested in Alabama when it became a state, means waters actually navigable for commercial use, and does not contemplate swamp island or marsh islands, though such areas, or a part thereof, be submerged at high tide, or even at all times. (United States v. Property on Pinto Is., 74 F. Supp. 92, 104).”
(7) The State offered no proof that defendant created or maintained a public nuisance.
(8) The State offered no proof that defendant polluted the waters of the State.
FINDirrGS OF FACT
The court finds that defendant’s land is marshland, and not an arm of Moriches Bay, or “ land underwater.”
The plaintiff State has failed to sustain its burden of proving acquisition of any portion of defendant’s property as set forth in defendant’s Exhibits K and O, by accretion or by any due process of law.
That no permit was required by defendant from the Trustees in order that he may fill in his own property.
*795 That defendant holds title to the property in question, through allotments made by defendant’s remote grantors in 1712; by means of the registration proceedings and judgment rendered thereon in favor of Bichard 0. Culver in 1950; and by the subsequent conveyance by Culver to the defendant on August 12,1969.
That the plane of mean high water mark is the edge of the bog as it presently exists on the northern line of defendant’s property.
That no testimony was adduced or evidence presented to establish that defendant has created or maintained a public nuisance or has polluted the waters of the State.
CONOLTTSXON ON LAW
Plaintiff having failed to sustain its burden of proof with respect to its three causes of action, they are dismissed. The temporary restraining order and preliminary injunction previously granted herein are vacated.