The opinion of the Court was delivered at this term by
Parker C. J.
By the common law, it is clear, that all arms of the sea, coves, creeks, &c., where the tide ebbs and flows, are the property of the sovereign, unless appropriated by some subject by virtue of a grant, or prescriptive right, which is founded on the supposition of a grant. Hale de Jur. Mar. pt. 1, c. 1, 2, 3. The right, however, of fishing in such places, or sailing over them m boats, is common to all the subjects, but liable to be restrained or regulated by the sovereign power. So that the proprietor of upland contiguous has no greater right to the use of such privileges, than other subjects who are not the owners of upland.
And this right of the sovereign extends to ordinary high-water mark ; so that the shore, which is the space between high-water and low-water mark, belongs also to the sovereign ; the property of the owner of the upland reaching only to that line which limits the waters in the ordinary course of the tides. Storer v. Freeman, 6 Mass. Rep. 435.
This right in the waters and shores of the sea passed from the crown, by letters patent from James the First, to the council established at Plymouth, in the county of Devon, for the planting, &c. of New England, and from that council so much of their territory thus acquired as was contained in the colony of Massachusetts Bay was transferred to the company who undertook the settlement of that colony ; and their grant was confirmed by the charter of King Charles the First, which constituted the company a body corporate and politic, giving them absolute property in the land within the limits of the charter, the power of making laws for the government of the colony, and full dominion over all the ports, rivers, creeks, and havens, &c., in as full and ample a manner as they were before held by the crown of England. Anc. Charters, &c. 1.
*188 The company to whom this charter was made, having assumed a political capacity and become a state, exercised dominion. over all the land within the limits of the charter, and all the privileges, immunities and franchises connected with it, as public property, parcelling it out in townships or smaller divisions for the purpose of settlement; so that, by virtue of the grant from the Plymouth Company, the charter of King Charles, and actual possession and disposition of it, the people of the colony, in their politic capacity, succeeded to all the territorial rights, franchises and immunities which had ever belonged to the sovereign power of the parent country.
Among the earliest acts of legislation was an exercise of sovereignty with respect to the shore, or flats, of coves, creeks, &c., which abounded all over the seacoast. By the common law, it has been seen, he to whom a house lot was granted, which was bounded upon the sea, would be the proprietor only as far as high-water mark. The desire and necessity of wharves, quays or piers was soon felt by individuals and the community, and the occupation of flats became indispensable. The government then, to encourage these objects, and to prevent disputes and litigations, transferred its property in the shore of all creeks, coves, and other places upon the salt water, where the sea ebbs and flows, giving to the proprietor of the land adjoining the property of the soil to low-water mark, where the sea does not ebb above one hundred rods. This was a grant of so much of the shore as would be contained within the exterior lines of the upland lot extended from high-water to low-water'mark, provided it did not extend more than one hun dred rods. Anc. Charters, &c. 148.
The exceptions and provisions in this ordinance show clear ly, ..hat the principles of the common law relating to this kind of property were well understood by the colonial legislature. Those who thus acquired the property of the shore were restricted from such a use of it as would impair the public right of passing over the water, in boats or other vessels, through any sea, creeks, or coves, to other men’s houses or lands ; by which it was intended to reserve a free passage over the water in such places, in the same manner as it existed before the public property in the shore was transferred. The ordinance of 1641 *189 lias therefore made no alteration in the use of places therein described, while they are covered with water, and they remain free for all the citizens of the Commonwealth ; so that even the proprietor of the flats can lawfully erect nothing upon them, which will obstruct or hinder such passage, though he may build wharves extending towards the sea to the distance of one hundred rods, provided he do not thereby straiten or interrupt the passage over the water in such manner as to constitute a public nuisance.
To build a bridge, therefore, from shore to shore over a navigable cove or creek, whereby the usual passage of boats or other craft would be impeded, could not be justified even by the owner of the soil; for he has, only a qualified property in it, under the ordinance of 1641. None but the sovereign power can authorize an interruption of such passages, because this power alone has the right to judge, whether the public convenence may be better served by suffering bridges to be thrown over the water, than by suffering the natural passages to remain free; and this power may exact such conditions as to the manner of building, as will sufficiently preserve the natural passage, at the same time that the public may be accommodated with an artificial one.[1] Conformably to this principle, it has been usual, when a bridge was wanted over any creek, cove, or other inlet from the sea, for application to be made to the General Court, although no toll was intended to be taken, and an act has passed pursuant to such application. Instances of the kind are frequent in our statute books ; in some cases it nas been required, that draws should be made in the bridge; in others, that it should be so constructed that boats or gondolas loaded with hay might pass under without obstruction; according to the use which has been made of the water over which the bridge was to be erected. (See St. 1804, c. 11, 16, 51; St. 1805, c. 1; St. 1801, c. 33; St. 1802, c 74.)
There can be no doubt, therefore, that, by the principles of the common law, as well as by the immemorial usage of this government, all navigable waters are public property for the use of all the citizens; and that there must be some act of *190 the sovereign power, direct or derivative, to authorize any mterruption of them. The legislature may, without doubt, by a general law, delegate to the magistrates of a country, or to any other body-, the power of determining when public convenience requires that a bridge should be thrown over a creek or a cove, but, until they have made such delegation in express terms, it is a branch of sovereign power to be exercised by the legislature alone.
Upon this ground it was determined, in the case of Commonwealth v. Coombs, that the Court of Sessions, to which body was given by a general law the power of laying out public ways, had not power to lay out such a way over a navigable river, so that the river might be obstructed by a bridge.
The statute giving power to the Court of Sessions, it is there said, must have a reasonable construction. “ A navigable river is of common right a public highway, and a general authority to lay out a new highway must not be so extended, as to give a power to obstruct an open highway already in the use of the public.” And in the case of The Inhabitants of Arundel v. M'Culloch, the same principle is recognized. The Court say, “ It is an unquestionable principle of the common law, that all navigable waters belong to the sovereign, or, in other words, to the public ; and that no individual or cor poration can appropriate them to their own use, or confine or obstruct them so as to impair the passage over them, without authority from the legislative power. It is upon this principle, that so many acts of our legislature have been passed, authorizing the building of bridges over various streams and rivers within the Commonwealth.”
I do not know that this doctrine has been contended against, in the argument of the case before us. The question has been rather a question of fact than of law, to wit, whether the ■ streams over which the bridges stand, for not repairing which the defendants are indicted, are navigable streams, within a reasonable use of those terms, so as to be public property in the manner before stated.
It may be remarked, that, by the common law, the property of the sovereign is said to extend to all places where the sea ebbs and flows, whether such places are navigable or not; but *191 it is probable the usages of our country have given a reasonable limitation to this doctrine, confining the public right to what may be of public use ; so that in many little creeks into which the salt water flows, but which are incapable of being ed at all, private property may be maintained. This is undoubtedly the case with many of the creeks which run through our extensive marshes, over which small bridges are thrown for the convenience of removing the hay ; and yet whenever these streams are large enough for the passage of boats, and gondolas, or lighters, and pass through the lands of several proprietors, no one can obstruct them, even in his own grounds, unless he has acquired a right by prescription ; which probably is the case with many of them.[1] The question, then, in the case before us, is, whether the streams over which the bridges are placed, are public highways ; if they are, the order of the Court of Sessions laying a road over them is void. This question has been only formally decided by the jury, and comes before us upon a motion to set aside the verdict, because the facts proved show that the road was illegally laid out; so that the verdict returned against the defendants is contrary to the evidence. If it appears from the evidence in the case, that the streams in question are navigable to any useful purpose, as that in our opinion would make them public property, the verdiet ought to be set aside.
The evidence reported abundantly proves the navigableness of Miller’s River for boats, scows, and lighters, with heavy loads of manure, wood, &c. and several witnesses testified to the actual use of the stream, by such vessels, before and until the bridge was built.
The facts thus testified were not contradicted. The effect of them was attempted to be avoided by an argument, which probably would be successful with the legislature, on an ap *192 plication for license to build a bridge. It is said, there could ije but little use of this stream for boats or other vessels ; that there is not, and probably never will be, any settlement or place of business at its head, or on its banks; that the public are vastly more accommodated by a bridge than they would be by an unobstructed passage of the stream. All this is probably true, and yet does not affect the question before us; for if the stream is a navigable river, it is for common use, and none but the legislature can authorize the interruption of it. If the Court were to undertake to decide these questions of expediency, it would not be declaring law, but would be legislating upon each particular case. The same arguments might have been used, if individuals or corporations, without authority from the legislature, had thrown bridges over Mystic River, where the Chelsea and Malden bridges now are. Probably the advantage of navigating that river would bear no comparison, in public estimation, with the utility of such bridges ; yet none would suppose, that any thing short of legislative authority would have warranted the building them. The difference between Mystic and Miller’s River is only in their magnitude ; there is no difference in the law to be applied to them.
The principle upon which the public right to navigable streams rests having never been controverted, and the necessary inference being, that no subordinate power can authorize any use of them, inconsistent with that right, there could be no difficulty in settling this or any other question relating to them, were it not that the insignificance of some of the streams, and the little use made of them for purposes of transportation, render the application of the principle sometimes questionable, on the ground of expediency. But this difficulty is solved by referring all such cases to the legislature ; which will always relinquish the public control over such waters, when the public interest shall require it. There is but one principle for judicial courts to be governed by, and that is, to consider as public property all those inlets of the sea, which are capable of sustaining vessels of e-iv description, with their loading, for purposes really useful ;.o trade or agriculture. It has been urged, that the actual y*c *193 of them for such purposes is necessary, to give them the character of public property ; but it is obvious, there can be no such qualification of the principle at common law ; for it would go to allow the occupation, by individuals or corporations, of many of the most important public privileges, in the early settlement of the country, before ports and places of deposit should become valuable.
It was urged also in argument, that a stream, to be public, must be actually a highway, leading from county to county ; but there is no authority for this position. Highways, according to the common law, are places in which all the subjects have a right to pass ; and this is peculiarly the case with the sea and all its branches. It is by statute only, that those roads are denominated highways which lead from town to town, to distinguish them from those which are laid out for the use of one town only, or certain individuals in one town, with a view to the different tribunals which are to authorize the aying them out.[1]
We have considered with much attention a position advanced by one of the counsel for the prosecution, viz. that a bridge being actually in existence, the defendants, by the general laws, are obliged to keep it in repair, without reference to the original lawfulness or unlawfulness of the establishment of it. This position may be true in regard to ancient ways, the origin of which cannot be traced, but which have immemorially been in use.[2] A way may exist by prescription. But we think it cannot be true, that a bridge or road, recently built or laid out without any authority, can impose any obligation on the inhabitants of the town where it may be. This would be to encourage individuals to act from their own authority in such cases, and to punish others for any imperfect execution of their work. A way may also be given to the public so as to prevent the owner of the land from maintaining trespass against those who pass over it ; but until it is laid out and established by. the lawful authority, it cannot become *194 a charge to the inhabitants of the town through which it pass es. But in the case before us, the bridge is supposed to be an obstruction to a highway before existing; a mere dedication or use of it, therefore, cannot purge the wrongful erection of it; and the town which is called upon to repair it has a right to show that it has no legal existence. And so it was ruled in the case of Coombs, and in the case of J\'P Culloch, before cited. The orders of the court for laying out the roads in those cases were considered void ; if void, the bridges over the streams were nuisances, and if nuisances, no town could be held to keep them in repair.[1]
Though the reasoning, in the foregoing opinion, has been principally applied to one of the counts in the indictment, viz that which charges the inhabitants with neglect to repair the bridge over Miller’s River, it is equally applicable to the other count, with respect to which the evidence reported abundantly proves the navigableness of the stream therein described, and the former use of it for valuable purposes. The verdict therefore must be set aside, and a new trial granted.

 See Commonwealth v. Breed, 4 Pick. 460.

 See Commonwealth v. Pierce, 2 Dane’s Abr. 696. Rivers are considered navigable as far as the tide ebbs and flows, and not navigable above that point. Commonwealth v. Chapin, 5 Pick. 199; Hooker v. Cummings, 20 Johns. R. 90; Palmer v. Mulligan, 3 Caines’s R. 307; Scott v. Wilson, 3 N. Hamp. R. 321. Contra, Cates v. Wadlington, 1 M’Cord, 580; Carson v. Blazer, 2 Binney, 475; Shrunk v. Schuylkill Nav. Co. 14 Serg. & R. 79. See Berry v. Carle, 3 Greenl. 269; Adams v. Pease, 2 Conn. R. 481; Shaw v. Crawford, 10 Johns. R. 236.

 Selectmen are not authorized to lay out a landing-place or a town way betwee' High-water mark and the channel of a navigable river. Kean v. Stetson 5 Pick. 492.

 See Estes v. Troy, 5 Greenl. 368; Todd v. Rome, 2 Greenl. 55; Rowell Montville, 4 Greenl. 270.

 See Jones v. Andover, 9 Pick. 146.