EDWARD K. MACRUM et al., Appellants, *v.* RICHARD W. HAWKINS et al., Individually, and Constituting the Board of Supervisors of Suffolk County, et al., Respondents.

(Argued January 12, 1933; decided February 28, 1933.)

M. E. Harby for appellants. Incumbency in office as member of the board of supervisors was incompatible with incumbency in office as member of the planning board. (*People* v. *Ahearn*, 131 App. Div. 30; 196 N. Y. 221; *People ex rel. Ryan* v. *Green*, 58 N. Y. 295; *Attorney-General ex rel. Moreland* v. *Detroit Common Council*, 112 Mich. 145; *State* v. *Wittmer*, 50 Mont. 22; *People* v.

*Conoly,* 238 N. Y. 332; *People ex rel. Earwicker* v. *Dillon,* 38 App. Div. 539; *Lambert Lumber Co.* v. *Jones Eng. Const. Co.,* 47 Fed. Rep. [2d] 74; *People* v. *Tremaine,* 252 N. Y. 27; *Williams* v. *City of New York,* 118 App. Div. 756; 192 N. Y. 541; *Village of Fort Edward* v. *Fish,* 156 N. Y. 366.) Because three incumbents on the board of supervisors accepted appointment to the second incompatible office, such incumbents on the first board vacated their incumbency thereon. (*People ex rel. Kelly* v. *Common Council,* 77 N. Y. 503; *People ex rel. Henry* v. *Nostrand,* 46 N. Y. 375; *Commonwealth* v. *Hawks,* 123 Mass. 525; Public Officers Law, § 31; *Young* v. *Rochester,* 73 App. Div. 81; *People* v. *Carrique,* 2 Hill, 93; *People* v. *Dillon,* 38 App. Div. 539; *King* v. *Hughes,* 5 B. & C. 886.) The board of supervisors was without power even by a statutory vote, without the request of taxpayers or towns, to authorize the issuance of bonds for the construction of bridges across navigable waters and, in no event, did it have power to obstruct navigation. (County Law, art. 5.) If section 320-b of the Highway Law be held authority for the construction of the bridges, then it authorizes by inference bridges which obstruct navigation, and by inference thereby abrogates the right of free navigation, (*People ex rel. Lehigh V. Ry. Co.* v. *State Tax Comm.,* 247 N. Y. 9; *Transit Commission* v. *L. I. R. R. Co.,* 253 N. Y. 345; *Delaware, L. & W. R. R. Co.* v. *City of Buffalo,* 158 N. Y. 266; *City of Buffalo* v. *Delaware, L. & W. R. R. Co.,* 136 App. Div. 274; 204 N. Y. 562.) A Federal permit cannot legalize a bridge over navigable waters if it is forbidden, or if it is not affirmatively authorized by statute. (*Little Falls Fibre Co.* v. *Ford & Son,* 249 N. Y. 495; *People* v. *International Bridge Co.,* 223 N. Y. 137; 254 U. S. 126; *Cummings* v. *Chicago,* 188 U. S. 410.)

*Joseph Steven Frank* and *Guy O. Walser* for respondents. The board of supervisors had power to authorize con-

struction of the bridges by the county as part of the roads in the county road system in which the bridges lie. Questions of design, location or extent of impairment of navigation are not for the courts. (*Matter of Burns*, 155 N. Y. 23; *People ex rel. Morrill* v. *Supervisors*, 112 N. Y. 585; *Keene* v. *Supervisors*, 142 N. Y. 271; *Markey* v, *County of Queens*, 154 N. Y. 675; *Robia Holding Corp.* v. *Walker*, 257 N. Y. 431; *Escanaba Co.* v. *United States*, 107 U. S. 678; *Cummings* v. *Chicago*, 188 U. S. 410; *Southern Railway* v. *Ferguson*, 59 S. W. Rep. 343; *People* v. *Delaware & Hudson*, 213 N. Y. 194; *Village of Saratoga Springs* v. *Saratoga Gas Co.*, 191 N. Y. 132; *Citizens' Sav. Bank* v. *Town of Greenburgh*, 173 N. Y. 215; *People ex rel. Lehigh Valley Ry. Co.* v. *State Tax Comm.*, 247 N. Y. 9; *Town of Southhold* v. *Parks*, 41 Misc. Rep. 456; 97 App. Div. 636; 183 N. Y. 613; *South Carolina* v. *Georgia*, 93 U. S. 4; *Gibson* v. *United States*, 166 U. S. 269; *Hill* v. *Supervisors*, 12 N. Y. 52; *People ex rel. Root* v. *Supervisors*, 146 N. Y. 107; *Southlands Co.* v. *City of San Diego*, 211 Cal. 646; *Denton* v. *Pulaski County*, 170 Ky. 33; *Aransas County* v. *Coleman-Fulton Pasture Co.*, 108 Tex. 216.) The creation of the county planning board by the county board of supervisors and the appointment by that board of three of its members to constitute the planning board, did not affect the composition of the appointing board, or the standing of the three appointees as town and county supervisors. (*Queens County* v. *Petry*, 54 App. Div. 115; *Matter of Noble*, 34 App. Div. 55; *Ontario County* v. *Shepherd*, 100 App. Div. 200; *Village of Carthage* v. *Frederick*, 122 N. Y. 268; *Woods* v. *Madison County*, 136 N. Y. 403; *Kittinger* v. *Buffalo Traction Co.*, 160 N. Y. 377; *People ex rel. Trustees of Village of Jamaica* v. *Queens County Board of Supervisors*, 131 N. Y. 468; *Govers* v. *Board of Supervisors*, 171 N. Y. 403; *Weston* v. *City of Syracuse*, 158 N. Y. 274; *People ex rel. O'Connor* v. *Supervisors*, 143 N. Y. 370.) If membership in the planning board be considered public office, then the appointment

of the three supervisors thereto was a nullity through the inability of the board of supervisors to appoint its own members. The original position of the three supervisors involved would not be affected by the attempted appointment. (*Wood* v. *Town of Whitehall,* 120 Misc. Rep. 124; 206 App. Div. 786; *State* v. *Kearns,* 47 Ohio St. 566; *Meglemery* v. *Weissinger,* 140 Ky. 353; *People* v. *Purdy,* 154 N. Y. 439; *Burtis* v. *Haines,* 91 N. J. L. 4; *People ex rel. Sulzer* v. *Sohmer,* 211 N. Y. 565; *Metzger* v. *Swift,* 258 N. Y. 440; *Matter of Hulbert* v. *Craig,* 124 Misc. Rep. 273; 213 App. Div. 865; 241 N. Y. 525.) Section 320-b, subdivision 2, of the Highway Law specifically authorizes county supervisors to issue county bonds to provide a county contribution to the county road fund to be applied to the construction, reconstruction or maintenance of a highway under the provisions of the section. (*Southlands Co.* v. *City of San Diego,* 211 Cal. 646; *Robia Holding Co.* v. *Walker,* 257 N Y. 431; *Denton* v. *Pulaski County,* 170 Ky. 33; *Aransas-County* v. *Coleman-Fulton Pasture Co.,* 108 Tex. 216; *Robert* v. *Supervisors of Kings County,* 3 App. Div. 366; 158 N. Y. 673; *People* v. *Carpenter,* 24 N. Y. 86; *Smith* v. *Helmer,* 7 Barb. 416.)

KELLOGG, J. The board of supervisors of the county of Suffolk, consisting of ten members, on March 31, 1930, adopted a resolution establishing a county planning board, pursuant to the provisions of article 12-B of the General Municipal Law (Cons. Laws, ch. 24), an article newly added thereto by chapter 539, Laws of 1925. The resolution, adopted by a vote of nine to one, named three of the members of the board of supervisors, to wit, Supervisors Warta, Neville and Hildreth, to constitute the planning board. Prior to March 30, 1931, the three supervisors so named, acting as the planning board, having made their survey of county needs and determined upon plans to meet them, submitted their report to the board of supervisors. The report called for an expenditure by the county of $5,000,000, " Upon a county

wide improvement program." The sum of $3,350,000 was proposed to be spent in the construction of bridges and connecting roadways; the sum of $950,000 in dredging certain harbors; the sum of $600,000 on parks and parkways; the sum of $100,000 upon an addition to a county tuberculosis hospital. On March 30, 1931, the board of supervisors met and accepted the report of the planning board. At this meeting it was resolved that the improvements recommended should be made, and that bonds, in the sums and for the several purposes named, should be issued to provide moneys to execute them. Nine supervisors, including Warta, Neville and Hildreth, voted for the resolutions, and one supervisor voted against. Later, on April 27, 1931, the board of supervisors passed a resolution slightly modifying the amounts allotted to each of the four projects, but not diminishing the total expenditure or total bond issue below $5,000,000, as previously determined upon. Again the vote was nine in favor of the amended project and one against, each supervisor voting as he had before. The appellant taxpayer attacks the legality of the entire bond issue proposed on the ground that the county could not create " a funded debt " unless a resolution to that end were passed by " a two-thirds vote of all the members elected to the board " (Gen. Municipal Law, § 6), and that the resolutions now under attack were not so passed. In making this contention, it reasons that when Warta, Neville and Hildreth became members of the county planning board they accepted incompatible offices, thereby ceasing to be members of the board of supervisors, so that the resolutions to bond received a vote, not of nine to one, but of six to one, which is not two-thirds of a total membership of ten.

Article 12-B, as originally adopted, provided: " Any county or counties and the cities, towns and villages in such county or counties may establish a regional planning board to consist of representatives of such county or

counties and of such cities, towns and villages. The members of the board shall receive no salary or compensation for their services as members of such board." (§ 239-b.) The duties of the boards are thus described: "Said boards are hereby empowered to and shall study the needs and conditions of regional and community planning in such county or counties and prepare plans adapted to meet such needs and conditions, and shall, through such agencies as it may designate, collect and distribute information relative to regional and community planning and zoning in such county or counties, and the exercise of such powers is hereby declared to be for a public purpose and all moneys expended for such purposes are declared to be for municipal use." (§ 239-d.) The board is required to make a report, on or before January first in each year, to the Governor of the State, with its recommendations for legislation, if any. (§ 239-d, as amd. by Laws of 1927, ch. 314.) It was not until 1932 that the article was amended to provide, in section 239-d, subdivision 2, that after adoption of the plans of the planning board by the board of supervisors, the plans should be binding on the latter board, and "no expenditure of public funds" should be made "except in accordance with such county plan." (Laws of 1932, ch. 137.)

It will be seen that the members of the planning board were not required to take oaths of office or to file bonds; they were not to be appointed for definite terms; they were to receive no commission of office; they were provided with no official seal; they were to receive no pay for services rendered; they were to decide nothing; they were to perform no definite official act. Their only functions were to study "needs and conditions," to prepare plans to meet them, to collect and distribute information in regard to regional planning, and, finally, to make a report to the Governor of the State. The board of supervisors might have committed the same work of

collecting information and reporting plans, required of a planning board, to a committee of its own membership, without establishing such a board. Surely the fact that the supervisors, instead of confiding the work to three of its members, as a committee of itself, chose to appoint the three to constitute a planning board under the statute, in order to do the identical work, did not make them independent public officers, whose functions, as such, were incompatible with the exercise of their functions as supervisors.

The argument that the three supervisors, when appointed to the planning board, accepted independent public offices, would defeat the very purpose sought to be attained. There are many authorities which hold that a member of a public board is not eligible to receive an appointment to an independent office at the hands of such public board. Thus members of a board of supervisors are not eligible to appointment by the board to the offices of drain commissioners: " Whether they voted for their own appointment does not affirmatively appear, but they had as much right to do so as the others had to vote for them." ( *Kinyon* v. *Duchene,* 21 Mich. 498, 499.) The members of a board of health may not appoint one of their own number to the office of quarantine physician: " The first question is whether, under the ordinance, the board of health lawfully and properly could elect one of themselves to this office. We are of opinion that they could not." ( *Gaw* v. *Ashley,* 195 Mass. 173, 176.) The board of directors of a county infirmary may not appoint one of its members to the superintendency thereof; when the board of directors is given authority to appoint a superintendent this " necessarily means that the person appointed shall be different from those who appoint." ( *State of Ohio ex rel. Louthan* v. *Taylor,* 12 Ohio St. 130, 134.) To the same effect are *State* v. *Kearns* (47 Ohio St. 566); *Meglemery* v. *Weissinger* (140 Ky. 353); *Wood* v. *Town of Whitehall* (120 Misc. Rep.

124; affd., on opinion below, 206 App. Div. 786). Granted that the three supervisors were not eligible for appointment to the planning board, and that no such board came into existence, the validity of the resolutions of the board of supervisors would not in the least be affected thereby, since their legality was in no wise conditional upon the adoption of plans made by the planning board.

One of the resolutions adopted by the supervisors on April 27, 1931, recited the fact that the board had previously designated for construction " with moneys from the State Aid Fund " certain described roads. One of the roads is described as " No. 44. North Haven-Shelter Island Road from a point on County Highway No. 911 running northerly across Shelter Island Sound to a point on County Highway No. 910, a distance of 0.70 miles in the Town of Southampton and 0.80 miles in the Town of Shelter Island." The other is described as " No. 45. Shelter Island Road from a point on County Highway No. 910 running northerly along Manhasset Road to Hay Beach Point, thence northerly across Gardiners Bay to Shipyard Road at Cleaves Point, thence northerly along Shipyard Road to the Greenport-Orient Point Highway, a distance of 3 miles in the Town of Shelter Island and 0.90 miles in the Town of Southold." A reference to the maps appearing in the record will show that road No. 44 was designed to connect Shelter Island, in Gardiners bay, at the easterly end of Long Island, with the mainland of Long Island on the south; that road No. 45 was designed to connect Shelter Island with the mainland on the north. This necessarily would involve, as the chief expense, the construction of two great bridges. Plans for these proposed bridges, which were adopted by the supervisors, are shown in the records. They indicate a bridge for road No. 44, which spans more than 2,000 feet of water, and is suspended from piers, 26 feet wide by 56 feet in height, set in 37 feet of water; for road No. 45, a bridge which spans more than 4,000 feet of water,

suspended from piers 33 feet by 77 feet, set in 47 feet of water. The resolution also recites that the necessary cost of constructing road No. 44, including the bridge, will be $1,100,000; that the necessary cost of road No. 45, including the bridge, will be $1,900,000. The resolution then proceeds as follows: "Resolved, that in order to raise said amount of $3,000,000 for the above purposes, there shall be issued Three Million Dollars ($3,000,000) bonds of the County of Suffolk, designated 'County Road Bonds, Series of 1931.'"

It has been found that the waters designed to be crossed by these two bridges are navigable waters; that they are arms of the Atlantic ocean contained within the geographical boundaries of the State of New York; that they are subject to navigation by vessels engaged in international and interstate commerce; and by vessels not engaged in commerce. It has been conceded that some of the vessels accustomed to traverse these waters have masts higher than the elevation of the proposed bridges. It was found as follows: "The piers which are to support the bridges approved by the Chief of Engineers and the Secretary of War of the United States, designed to be constructed by Suffolk County, diminish the navigable capacity of the waters which they are designed to cross."

There can be no doubt that a State within its geographical borders is the owner of lands beneath tidal waters; that, within such borders, bays and arms of the sea, the headlands of which are not more than six geographical miles apart, are a part of the territory of the State; that these lands are held in trust for the People of the State; that navigable waters are of right public highways; that these rights may not be impaired or abridged except by the authority of the Legislature of the State, through the act of any individual or corporation, municipal or private. (*Manchester* v. *Massachusetts*, 139 U. S. 240; *People ex rel. Howell* v. *Jessup*, 160 N. Y. 249; *People ex rel. Palmer*

v. *Travis*, 223 N. Y. 150; *People ex rel. Lehigh Valley Ry. Co.* v. *Tax Comm.*, 247 N. Y. 9; *Little Falls Fibre Co.* v. *Ford & Son, Inc.*, 249 N. Y. 495; 2 Farnham on Water and Water Rights, § 327.) " There are three cases in which authority from the Legislature is necessary to erect a bridge over a stream. One is when the stream is navigable; 2d, when the State owns the bed of the stream; and 3d, when the right· to take toll is desired." (*Fort Plain Bridge Co.* v. *Smith*, 30 N. Y. 44, 63.) " There is no question that the bridging of a navigable stream without legislative authority in such a way as to interfere with navigation is a public nuisance." (Farnham, § 327.) Congress has provided that no bridge across navigable waters may be erected until the consent of Congress therefor has been obtained, " provided that such structures may be built under authority of the Legislature of a State across rivers and other waterways the navigable portions of which lie wholly within the limits of a single State, provided the location and plans thereof are submitted to and approved by the Chief of Engineers and by the Secretary of War before construction is commenced." (U. S. River and Harbor Act of 1899, 30 U. S. Stat. 1151, ch. 425.) Unless, therefore, the Legislature of the State of New York has given its consent, the bonds, proposed to be issued to raise moneys to erect the bridges in question, may not be issued, because not designed to effect a lawful purpose.

The State Constitution (Art. III, § 18) provides that the Legislature shall not pass a private or local bill, among other things, " providing for building bridges, and chartering companies for such purposes, except on the Hudson river below Waterford, and on the East river, or over the waters forming a part of the boundaries of the State." As these bridges do not come within the terms of the exception, legislative consent to their construction, if any, must be found in general laws.

The only general laws expressly empowering a county

board of supervisors to erect bridges over navigable waters, to which our attention has been called, will be found in article 5 of the County Law (Cons. Laws, ch. 11). Section 61 empowers a county, on the application of twenty-five resident taxpayers, to " construct, repair or abandon a county bridge therein." This section does not apply, *first*, because admittedly the taxpayers' application referred to was never presented, and, *secondly*, because it does not relate to navigable waters. Section 62 provides that the board of supervisors " may authorize the location, change of location and construction of any bridge, applied for by any town or towns;" but " if such bridge is to cross a navigable stream, provision shall be made in the resolution or permission authorizing the same, for the erection of a suitable draw, to prevent any obstruction of the navigation of such stream." This section does not apply for the bridges resolved upon are not bridges to be provided with a draw.

The resolutions provide that the roads and bridges in question shall be constructed, as county roads, out of the county road fund, under new section 320-b, inserted in the Highway Law (Cons. Laws, ch. 25) by chapter 362, section 17, Laws of 1929, as amended by chapter 770, Laws of 1930. Both parties insist that this section is complete in itself; that it provides for *county roads* which must be distinguished from *county highways* provided for by section 320, and town highways to be constructed with *county aid*, provided for by section 320-a; that section 320-b is the sole authority under which the board of supervisors acted. Indeed, sections 320 and 320-a expressly provide that the provisions contained therein shall not apply to roads constructed under section 320-b.

It is provided in section 320-b that the board of supervisors of any county may appropriate and contribute to the county road fund an amount to be applied to the construction, improvement or maintenance of county roads; that such moneys may be raised by the

county by tax or county obligations; that there shall annually be paid by the State to each county an amount equal to the amount paid by the county for such roads, except that the State shall not pay in any one year more than thirty dollars per mile for the total mileage of the highways within the county, other than State and county highways. The clerk of the board of supervisors, before the first of January in each year, shall transmit to the State Comptroller a statement of county moneys provided for roads under the section and the Comptroller shall draw his warrant upon the State Treasury in favor of the county treasurer for the amount due for the year. The moneys of the county and of the State, paid over for the purposes of the county roads, " shall become a common fund for the purposes of this section " and " the moneys which compose such common fund shall be deposited in a bank or banks to be designated by the county treasurer." (Subd. 5.) Maps shall be drawn by the county superintendent of highways, showing the proposed county road system, to be approved by the supervisors and the Superintendent of Public Works, and no road shall thereafter be constructed or maintained from the county road fund moneys, except the roads set forth upon such maps as they may have been amended. It is provided in subdivision 13 as follows: " Notwithstanding the provisions of sections nineteen and two hundred and sixty-two-a of this chapter, or any other statute, any bridge located on such county road system, when the same is to be constructed, reconstructed, maintained or repaired with county road fund moneys, shall be considered and deemed for such purposes a part of the road on which it is located; and all the provisions of this section relative to such road shall apply with equal force and effect to such bridge thereon for such purposes." It is upon this provision of subdivision 13 of section 320-b, and this alone, that the supervisors rely for their authority to build the bridges in question.

It will be observed that the chief, if not the only purpose of section 320-b is to empower the board of supervisors to build county roads and receive State aid therefor. Properly to achieve this end power is given to establish a joint road fund, containing State and county moneys; to impose limitations and duties in respect to the use of such funds; and otherwise to govern the methods and manner of county road construction. It cannot be that the Legislature had any thought that by the enactment of the section it would delegate to boards of supervisors its own power to consent to the erection of bridges over navigable waters. True, it is provided that " any bridge located on such county road system " shall be deemed " a part of the road on which it is located," for the purposes of the section. However, it will be noted that " any bridge " to be treated as a " road " is not expressly defined to include a bridge designed to span navigable waters. Indeed, navigable waters or navigation are no where mentioned in the section. It would seem that the Legislature by so providing meant nothing more than that bridges, such as those spanning creeks, non-navigable waters, gulleys or ravines, which are necessarily incidental to the construction of roads, should be treated as parts of the roads which are proposed to be constructed. That it should intend by the section to make a delegation of its sovereignty over navigable waters, to the extent of authorizing a board of supervisors, without condition or restriction, to permit an impairment of the common right of navigation, possessed by the people, through the erection of any form of bridge over navigable waters, seems altogether incredible. If it had so intended, it should so have expressed itself.

There are many authorities, especially in other jurisdictions, where it has been held that if a Legislature intends to give its consent that a bridge over navigable waters may be built, that intention must be expressed in

clear language. (*Commonwealth* v. *Inhabitants of Charlestown*, 18 Mass. 180; *Inhabitants of Marblehead* v. *County Commissioners of Essex*, 71 Mass. 451; *Commissioners on Inland Fisheries* v. *Holyoke Water Power Co.*, 104 Mass. 446; *State of Maine* v. *Anthoine*, 40 Me. 435; *Selman* v. *Wolfe*, 27 Tex. 68; *Barnes* v. *City of Racine*, 4 Wis. 454; *Hickok* v. *Hine*, 23 Ohio St. 523.) In *Commonwealth* v. *Inhabitants of Charlestown* (*supra*) it was said: " There can be no doubt, therefore, that, by the principles of the common law, as well as by the immemorial usage of this government, all navigable waters are public property for the use of all the citizens; and that there must be some act of the sovereign power, direct or derivative, to authorize any interruption of them. The legislature may, without doubt, by a general law, delegate to the magistrates of a county, or to any other body, the power of determining when public convenience requires that a bridge should be thrown over a creek or a cove, but, until they have made such delegation in express terms, it is a branch of sovereign power to be exercised by the legislature alone " (pp. 184, 185). In *Hickok* v. *Hine* (*supra*) it was said: " Where the legislature has power to require one public easement to yield to another more important, the intention to grant such power must appear by express words, or by necessary implication " (p. 531). Farnham says: " A general statute giving authority to construct highways and bridges is not sufficient to authorize the construction of a bridge over a public, navigable water, the title to the bed of which is within the state." (Waters and Watercourses, § 327.) Similar language has been used by the courts of this State. Thus in *Sage* v. *Mayor* (154 N. Y. 61, 81) the court said: " The permanent control of navigable waters, if alienable at all, should only be so by an instrument showing a clear and undoubted intention to that end." In *City of Buffalo* v. *Delaware, L. & W. R. R. Co.* (136 App. Div.

274, 280; affd., on opinion of KRUSE, J., 204 N. Y. 562) it was said that where an encroachment upon public rights is threatened, the parties seeking to justify it " must show that the statute authorized in express terms or by clear and unquestionable implication the doing of the very acts complained of." True, in *Robia Holding Corp.* v. *Walker* (257 N. Y. 431, 438) this court did say: " A power to construct and maintain a highway may by fair intendment include the right to build bridges as part of the highway." However, in that case, express authority had been granted by a special act to construct bridges over the East river. The only question involved was whether power to charge tolls for using the bridge was conferred, and it was held that such power was implied since by no other means could the provisions of the statute be carried out.

We have already noted the act of Congress which provides that a bridge may be built " under authority of the Legislature of a state across rivers and other waterways, the navigability of which lie wholly within the * * * state," provided the location and plans thereof are approved " by the Chief of Engineers and by the Secretary of War before construction is commenced." It is true that the approval of these officers has been obtained for the building of the two bridges. However, the certificates of approval signed by them are conditioned upon the fact recited therein, that the bridges will be constructed " under authority of the legislature of said state " of New York. As such authority has never been given, the certificates are without effect. In any event, the certificates were merely permissive; they did not constitute authority to erect the bridges; for such authority must proceed either from Congress, or from a State Legislature; and in this case authority has been received from neither. (*Little Falls Fibre Co.* v. *Ford & Son, Inc.,* 249 N. Y. 495.) We think that the board of supervisors

is without power to construct the two bridges in question or to issue bonds to raise moneys for their construction.

On April 27, 1931, the board of supervisors likewise passed a resolution authorizing the construction of another road from the county road fund at an expense of $350,000. This road is described as " Suffolk Boulevard from the Montauk Highway near Mastic southerly to the Atlantic Ocean, a distance of five miles in the Town of Brookhaven." While the construction of this road would involve the erection of a bridge, we do not understand that any attack is made upon it on the ground that it would cross navigable waters. Consequently, the issue of bonds for $350,000, to provide moneys for the building of this road, will be for a legitimate purpose.

The board of supervisors, on April 27, 1931, approved certain projects for the dredging of certain harbors, inlets and waters in the various towns of the county of Suffolk, and to provide moneys for the work authorized an issue of bonds in the amount of $1,000,000. These resolutions are stated to have been passed pursuant to authority granted by chapter 401 of the Laws of 1931, a law which took effect on April 13, 1931, and now constitutes subdivision 51-a, section 12, of the County Law. That act provides as follows: " The board of supervisors of the counties of Nassau and Suffolk may provide for widening, deepening or dredging any bay, harbor, inlet or channel within the respective boundaries and at the respective expense of such counties and may appropriate moneys available for general town improvements in aid of federal or state projects for such purposes. If sufficient funds are not available therefor, the county may issue bonds to provide moneys to pay the costs of the improvements and the expenditures authorized by this subdivision, in the manner authorized by law." It is said that the act authorizes dredging by the two counties named, only " in aid of federal or state projects for such purposes." We do not so read the statute.

It provides generally that the counties named may authorize dredging to be done " at the respective expense of such counties." It then provides for the method by which moneys may be obtained for the purpose. The supervisors " may appropriate moneys available for general town improvements in aid of federal or state projects for such purposes;" or if sufficient funds are not available the county " may issue bonds to provide moneys." We do not think the methods prescribed for providing the moneys were intended to curtail the power given to the supervisors generally to provide for dredging. We think that the proposed bond issue was authorized by law.

The board of supervisors, on the same date, passed resolutions authorizing an issue of bonds in the sum of $550,000 for parkway purposes, and an issue of $100,000 for an addition to a county tuberculosis hospital. We find no objection made to the validity of such bond issues, except the general objection made to all the bonds that they were not authorized by a two-thirds vote of the board of supervisors, and with this argument we have already expressed our disagreement.

The judgments should be reversed and judgment granted in accordance with this opinion restraining the defendants from issuing or selling bonds to provide moneys for the construction of the two Shelter Island roads, with costs to the appellants in all the courts. (See 261 N. Y. 691.)

POUND, Ch. J., CRANE, LEHMAN, O'BRIEN, HUBBS and CROUCH, JJ., concur.

Judgment accordingly.