Van Voorhis, J.
(dissenting). This is one of a series of taxpayers’ actions or proceedings affecting the affairs of the Town of Huntington, Suffolk County, Long Island, which are enumerated as follows:
(1) A proceeding under article 78 of the Civil Practice Act and consolidated actions under section 51 of the General Municipal Law, begun in March, 1949, attacking the acquisition by the board of trustees of the Town of Huntington of 22 acres of land for the establishment of a public bathing beach at Centerport within said town.
(2) A taxpayers’ action commenced under section 51 of the General Municipal Law in January, 1951, to (a) declare illegal and void two contracts by the board of trustees of said town with the United States Dredging Corporation, dated November 9, 1948, and January 25,1949, for the dredging of portions of Huntington Bay and Huntington Harbor, and providing for the sale and transfer of title to the sand and gravel thus excavated; (b) determine that the making of these contracts by the said town officials constituted “ void and illegal official actions, omissions and misconduct; that the aforesaid removal and appropriation, use and sale of the sand, grit or gravel of the Town of Huntington constitutes a waste and injury to the property, funds and estate of said Town ”; (c) compel the United States Dredging Corporation, and its officers, to account for all sand and gravel thus removed or appropriated, used or sold by them and for judgment against them and the town officials for the fair value of sand and gravel so claimed to have been converted; (d) declare illegal and void leases purporting to have been made by said trustees from H. B. M. Parking Corporation of five public parking places at different locations in Huntington Village, Huntington Station, East Northport and on Gerard Street Extension, and for judgment against the defendants (other than United States Dredging Corporation and its officers) for moneys paid to H. B. M. Parking Corporation as waste; (e) enjoin the expenditure of about $78,000 in funds received by the trustees from the sale of gravel pursuant to the said dredging contracts, and other income arising from town lands, without authorization by the town board or by special town election, and to compel such moneys to be applied pursuant to town budgets in reduction of taxes, and for judgment *236 against defendant town officials for portions of such moneys expended without such authorization, and for other relief.
(3) An action commenced May 1,1951, to restrain the submission to the electors of the Town of Huntington at a special meeting appointed to be held May 15,1951, of a proposition purporting to ratify the acquisition and development by the trustees of the Genterport Beach project, the letting of the two dredging contracts which have been previously described, the acquisition of various lots for recreation fields in Greenlawn, Bast North-port and Huntington Station, and separate parking lots in Huntington Village, Huntington Station and East Northport and on Gerard Street Extension, and the use by the trustees of the revenues from the dredging contracts and other sources for these purposes. The complaint in this action likewise asks for judgment declaring the said proposition to be null and void upon grounds about to be discussed.
It is this third action that is now before us on appeal, attacking the validity of the said proposition presented to the special town meeting on May 15, 1951. Before coming to grips with this question, it is necessary to mention the form of organization of the Town of Huntington, and to describe briefly the status of these other litigations.
The Town of Huntington was founded under colonial patents from the British Crown in the 17th Century. These patents, to be described later, vested title to the common lands in trustees, who were also constituted as the governing body of the town. Their governmental functions became vested later in the town board, but the trustees have retained title to those portions of the land granted by the Crown which they have not subsequently alienated. The same town officials who are members of the town board and the town clerk ex officio constitute the present trustees by statutory enactment (L. 1929, ch. 101). These dual public functions have been a fertile source of confusion and litigation.
The first of these litigations to be tried was the article 78 proceeding and the consolidated taxpayers’ action above described under (1), attacking the legality of the Genterport Beach project. Upon appeal, the Appellate Division dismissed the article 78 proceeding but sustained the taxpayers’ action, holding as follows: “ The fact that the trustees as such had or have the power to hold town property does not empower them to acquire real property *237 without compliance with sections 81 and 220 of the Town Law. The trustees were, therefore, without authority to purchase and maintain the beach and were without jurisdiction to do that which they did. This could he done pursuant to section 64 of the Town Law, only hy the town hoard and then only upon approval of the qualified electors at an election (Town Law, §§ 81, 220). We regard the acquisition and improvement of the tract as accomplished by the town board even though purportedly done by the same personnel, other than the town clerk, as trustees.” (Knapp v. Fasbender, 278 App. Div. 970, 971; italics supplied.)
These acts in the name of the trustees even when considered as having been performed in the capacity of the town board, were held to have been ineffectual in the absence of a valid submission to the qualified electors of the town. The Appellate Division also held that the cost “ was defrayed out of unexpended budget balances which in turn could not be utilized for the acquisition of a park or playground or parking place save upon approval of qualified electors. (Mander v. Coleman, 109 App. Div. 454 [3d dept.]; Leffingwell v. Scutt, 221 App. Div. 462 [3d. dept.].) ” The town officials were held personally liable, but the judgment entered upon the order of the Appellate Division included by its direction ‘[1] a provision for the holding of a legal election, at which an opportunity will be afforded to adopt or reject an approval of the action of the defendant officials and staying the execution of this judgment until such election is had with a validating effect; otherwise the judgment to be enforced.”
Notwithstanding that the proposition of May 15,1951, which is the subject of the instant appeal to this court, included the Centerport Beach project and had already been adopted when that decision was rendered by the Appellate Division, it was not relied upon but another subsequent special election was conducted at which the Centerport Beach project alone was presented to the electors, in the form of a proposition which recited the cost and identified by metes and bounds the real property acquired. The appeal taken to this court in the Centerport Beach case was withdrawn by stipulation after the special town meeting approved that separate project (303 N. Y. 803).
The holding that the trustees could not acquire real estate and that the town board could only do so for such purposes after public referendum under sections 81 and 220 of the Town Law, would *238 likewise invalidate the acquisition of the parking areas and recreation fields which were also part of the subject matter of the proposition before the special town meeting on May 15,1951, although they were not directly at issue in the Centerport Beach action. The May 15, 1951, proposition — at issue upon the instant appeal — appears not to have been relied upon to validate any of these transactions. Instead, after Huntington had become a town of the first instead of the second class, the town board adopted a resolution to acquire these parking areas and recreation fields subject to permissive referendum under sections 90-91 of the Town Law.
The reliance which is now placed — for the first time—upon the proposition of May 15, 1951, appears to concern the only remaining subject which it purported to cover, to wit, the dredging contracts. These contracts, in a monetary sense, are the largest of the projects included in this proposition. They provide for the sale of gravel at from 9 cents to 12 cents a cubic yard to be paid to the trustees, with the privilege in the United States Dredging Corporation of taking unlimited quantities of sand without charge. The complaint in the action above described as (2) alleges that in excess of $1,500,000 in profits had been derived by this corporation while the contracts still had four and three-quarters years to run. About $100,000 had been paid to the town trustees on these contracts by about the same time. They had assumed to exercise the power to spend these funds, or a substantial part of them, in such manner as they deem to be in the public interest, without being subject to the controls and safeguards imposed by the Town Law and other statutes regulating the government of the town. They contend that this town proposition of May 15,1951 (among other things) is an appropriation measure, ratifying and confirming their expenditures — if any confirmation was necessary— although no figures are mentioned in this proposition, and it is impossible for anyone voting for it to tell from reading it how much is being appropriated for what object.
No determination has been made and the evidence is not before us to establish whether the allegations in the complaint in action (2) challenging the legality of these dredging contracts are true. That action has not been tried.
It now becomes necessary to analyze the force or effect, if any, of the proposition passed at the special town meeting of May 15, *239 1951, the validity of which is challenged by the complaint in this action. The authority for conducting special town elections is article 6 of the Town Law. Section 82 of this article of the Town Law requires: “ The voting upon a proposition shall be by ballot and each proposition shall be separately stated and numbered thereon.” The point of this provision is that each proposition shall be voted upon separately lest by combination a popular project be used to carry an unpopular project. This proposition combined at least three different subjects,[1] which were not separately stated or numbered and had to be voted upon together. Section 223 of the Town Law provides that no obligation shall be incurred for any public improvement which is authorized by a town election “ in excess of the amount specified * * * in the proposition adopted at the town election.”[2] This proposition fastened numerous liabilities upon the Town of Huntington if it be upheld, but it contained no recital of the amounts of any of the liabilities to be created by adopting the proposition. It did not even put the voters upon notice that it would create any obligations of the Town of Huntington. There is no recital concerning the contents of the dredging contracts except that they are “ with the TJ. S. Dredging Oorp. for the dredging of Hunt *240 ington’s harbors and bays ” coupled with mention that there were to be ‘6 revenues therefrom ’ ’, which had been used or were to be used for the other projects. The circumstance is not mentioned that the United States Dredging Corporation could take all the sand that it wanted without charge, without being obligated to purchase any minimum quantity of gravel, or that dredging operations might be abandoned at any stage if they proved to be commercially unprofitable. No mention was made of the selling prices of the gravel nor of anything else in these contracts.
Twice previously the voters of the Town of Huntington rejected propositions to contract with the United States Dredging Corporation to deepen these waters and to dispose of the sand and gravel. In 1930 such a proposal was defeated by a resident property owners’ vote of 393 to 94. In 1935 a similar proposal was voted down by 2,035 to 785. Those dredging proposals were then submitted separately. At the special town meeting of May 15, 1951, this similar proposal was combined in a single proposition with the more popular Centerport Beach project and the acquisition of recreational fields in Greenlawn, East Northport and Huntington Station, as well as the public parking areas in Huntington Village, Huntington Station, East Northport and on Gerard Street Extension.
The dredging of Huntington Harbor and Bay and the sale or other disposition of sand and gravel bears no discernible relation to the acquisition and development of 22 acres at Centerport Beach, or these various recreational fields and parking areas. This single proposition to ratify these scattered projects supplied no clue to the qualified voters as to what parcels of real property had been bought with the money of the town, or concerning how much had been paid for them. In evidence are 20 deeds and 10 land contracts, dated in 1947 and 1948, covering various parcels of land, some connected, some disconnected, which it is impossible to integrate into the description of what was submitted to the voters for ratification. No identification of these parcels was presented even by reference, let alone by description, no maximum or other cost figure of anything was presented to the voters in the proposition adopted at the town election, and no common plan has been shown to exist which unites these undertakings. The short *241 and sketchy outline contained in “ Proposition No. 1 ”— there were no other propositions — that was submitted to the voters conveys no clear nor adequate idea of what they were to approve, nor did they have any means of knowing what would be the amount of the ensuing liabilities to be incurred by the Town of Huntington if they approved the proposition.
The purpose of separately stating propositions of this nature and their respective costs is stated in Village of North Tonawanda v. Western Transp. Co. (16 Abb. Prac. [N. S.] 297, 300) to be “ to enable each elector to vote separately for or against each object specified, and for or against the amount proposed to be raised for each object.” In McQuillin on Municipal Corporations (3d ed., Vol. 15, pp. 255-257), it is said concerning the same subject that “ there must be a separate proposition on the ballot for each distinct, unrelated and independent object or purpose for which indebtedness is contemplated, showing separately the amount desired for each, so that the elector may freely express his choice on each without thereby affecting the others.” McQuillin adds that “ each proposition should be stated separately and distinctly ” so as “ to prevent the joining of one local subject to others in such a way that each shall gather votes for all, and thus one measure, by its popularity or its apparent necessity, carries other measures not so popular or necessary and which the people, if granted the opportunity of separate ballots, might defeat.”
To the same effect is Village of Hempstead v. Seymour (34 Misc. 92, 95); and this rule regarding the submission to the electorate of local public works projects is followed in other jurisdictions: (State ex rel. City of Joplin v. Wilder, 217 Mo. 261; Blaine v. City of Seattle, 62 Wash. 445; Lanigan v. Town of Gallup, 17 N. M. 627, 642-644; City of Denver v. Hayes, 28 Col. 110).
Ratification imports knowledge of the facts material to the matter to be sanctioned retrospectively (Weber v. Bridgman, 113 N. Y. 600). Propositions to be submitted to the people are required to recite the basic facts concerning the matter to be approved. This need was recognized in Special Term’s opinion which stated: “ Such ratification was obtained by the special election of May 15, 1951. I find from the facts adduced at the trial that there was no confusion in the minds of the voters at *242 the time of election with reference to the proposition in question. * * * In addition, the acts as to which ratification was sought had been in operation and use for some time so that the citizens of Huntington had knowledge of them.”
The voters could not have learned the rudimentary facts from any recitals in this proposition. The record contains no evidence that they had learned them from other sources. When the town supervisor was asked how much money had been spent on one of these projects, he replied: “ I couldn’t even guess.” Questioned concerning the cost of various others, he answered: “ I wouldn’t have the slightest idea.” The dredging project, which was the largest, was thus characterized in his testimony: “ Q. Would you say it would cost many times more than $5,000 to dredge that harbor? A. It would have cost more than millions of dollars to dredge that harbor.” The record does not disclose what moneys had actually been paid or obligations incurred for these public works. If the costs of these projects were not known to the supervisor, who is the fiscal officer of the town, the trial court could not have taken judicial notice that the voters knew the costs. It is to insure that the voters know what expenditures they are authorizing or ratifying that section 223 of the Town Law requires that the expense of any public improvement shall be specified in the proposition adopted at the town election. The people may have known that dredges had been operating in the harbor and bay, that a public bathing-beach, playgrounds and parking areas had come into being in various parts of the town, but there is no evidence that they knew by whom or on what terms these projects had been authorized or what they had cost or of what they consisted. When it came to the proposition for approval of the Centerport Beach project after the decision by the Appellate Division in action (1) above, its proponents were quick to discover the necessity for stating the amount of money to be appropriated as well as identifying the real property which had been acquired and improved. That submission stands in complete contrast to the form of the proposition of May 15, 1951, which is invalid and ineffectual for any purpose.
In our view, this is the only question for decision upon this appeal. Not all of the members of the court share this view, and some consider that the decision of the action is controlled *243 by chapter 816 of the Laws of 1952. We give effect to the law as it exists at the time of our decision (Matter of Tartaglia v. McLaughlin, 297 N. Y. 419; People ex rel. Clark v. Gilchrist, 243 N. Y. 173, 180). But giving full effect to this local law, it is undisputed that it does not affect,the town proposition of May 15, 1951. Neither does it purport to ratify any possibly illegal aspects of these various improvements and appropriations, and if it did it would be unconstitutional. An important object appears to have been to quiet title to real estate in the Town of Huntington. It contains no reference to these dredging contracts, Centerport bathing beach, parking or other projects mentioned in the town proposition of May 15, 1951, and only by a strained construction could it be deemed to apply to them. I shall now discuss those questions, as well as the reasons on account of which we think that they are not involved upon this appeal.
The sole issue in this action, under the pleadings and as it was tried, is the validity of the proposition passed at the special town election of May 15, 1951. The effectiveness of that town proposition might well have been decided in an action challenging the legality of the public improvements to which it refers. That is not what occurred. What happened is simply that two weeks before the special town election was scheduled to be held, plaintiffs commenced this action to enjoin the conduct of the election upon the ground that the proposition to be submitted to the qualified electors to approve these improvements was inadequate and combined several subjects, and if adopted would be null and void. A temporary injunction was refused, with the consequence that the special election occurred before the suit was reached for trial, and it thereupon became one for a declaratory judgment concerning the validity of the proposition which by then had been passed at the election. It does not appear from this record whether these dredging contracts would have been illegal except for this town referendum, no concession of that kind was made, nor was their legality presented in this action which was brought merely to restrain the conduct of this special election. After the election, the court might have declined to assume jurisdiction to render a declaratory judgment (Bules Civ. Prac., rule 212), but its assumption of jurisdiction could not and did not transform this action into one *244 testing the legality of these public projects. It merely tests the legality of the confirmatory proposition that was passed at the town election.
If the town proposition of May 15, 1951, be held to be invalid — which is the maximum relief that can be granted to plaintiffs in this action — that does not amount to an adjudication that the improvements to which the proposition refers were illegally undertaken or completed. It merely amounts to deciding that the town proposition of May 15, 1951, was without force or effect, and leaves the status of the improvements where it would have been without any referendum to the voters at an election. This local law (L. 1952, ch. 816) is not claimed by anyone to bear upon the effectiveness of this special town election. Reading the statute demonstrates that, whatever else it may accomplish, it has nothing to do with the only matter that is at issue here. This is recognized in the brief for defendants (p. 29), which states that “ the only question before the Trial Court and the Appellate Division was whether the election of May 15th was effective for any purpose.” If that proposition was ineffective — as it clearly was — that would not invalidate the improvements, which may not have needed ratification. This record does not show what was their legal status. Defendants’ brief states (p. 29) that if claims of illegality concerning these improvements had been presented for adjudication in this action, “ it would have been necessary to have argued the effect of Chapter 816 of the Laws of 1952, which confirmed and validated all the acts of the Board of Trustees.” Defendants’ brief further states that the reason on account of which this local law was not urged upon the court as a defense in the instant action is that “ Those questions are presently being litigated by appellants in the pending case of Hubscher, et al. v. Fasbender, et al.”.
In view of the lack of discussion of this legislative act in the briefs upon the argument, a reargument was ordered by this court “ particularly with reference to whatever effect chapter 816 of the Laws of 1952 may have upon the subject matter of the action ” in order that we might be enlightened concerning the scope, purpose and validity of that statute. Long and careful briefs were submitted on the reargument analyzing the *245 meaning and constitutionality of this local law.[3] After the court had indicated that it was considering this statute, each *246 side tried to make the most of it, but the parties were correct in the first instance in assuming that it is not controlling here.
In order to understand whether chapter 816 of the Laws of 1952 was intended to apply to these improvements, the colonial history of the town must be reviewed briefly.
The colonial patents established governmental powers in a “ Body Politick and Corporate ” by the name of “ the Trustees of the Freeholders and Commonalty of the Town of Huntington ”, and transferred to them title to real property. These were recognized as two separate functions, the latter usually being described as proprietary and the former as governmental in nature. Under the Dongan and Fletcher patents, the trustees were empowered to act in a governmental capacity ‘ ‘ so always as the said acts and orders be in no ways repugnant to the laws of our Kingdom of England and of this our province which now are or hereafter shall be established ’ ’. In 1691, existing patents were ratified by act of the colonial Legislature and, after the Revolution, the first New York Constitution of 1777 confirmed and ratified the royal grants and charters, but the continuance of governmental powers in the trustees was qualified by the words ‘ ‘ until otherwise directed by the legislature ’ ’. Later the Legislature did direct otherwise, divesting the trustees of their governmental powers and subjecting the Town of Huntington to the governmental provisions of the Town Law, County Law, Highway Law, Tax Law and other applicable State statutes.
Title to the real estate acquired under the colonial patents remained in the trustees, however, to be held or sold and transferred pursuant to those patents (Robins v. Ackerly, 91 N. Y. 98; Trustees of Brookhaven v. Strong, 60 N. Y. 56; Town of Southampton v. Mecox Bay Oyster Co., 116 N. Y. 1; People ex rel. Howell v. Jessup, 160 N. Y. 249, 262; Sammis v. Town of Huntington, 186 App. Div. 463, 467; People ex rel. Squires v. Hand, 158 App. Div. 510, 515). Instead of being appointed by English colonial governors, elected town officials came to act ex officio as members of the board of trustees of the Town of Huntington and to perform their proprietary functions (L. 1872, ch. 492; L. 1929, ch. 101). As far back as 1831, it was aptly recited in resolutions adopted by a town meeting of the Town of Southampton, that there should be “ ‘ a law in regard to the powers and duties of the trustees, about which there began to *247 be so many conflicting opinions as construed from the charter of Governor Dongan ’ ”. (Town of Southampton v. Mecox Bay Oyster Co., 116 N. Y. 1, 14, supra.) An act was passed defining these powers specifically in the case of Southampton (L. 1831, eh. 283), but no such provision was adopted in the case of the Town of Huntington.
Chapter 816 of the Laws of 1952 appears to have been intended to define somewhat more precisely the powers and duties of the trustees of the Town of Huntington. Section 1 recites the Mcholls, Dongan and Fletcher Patents, and confirms legal title to the patented lands in the board of trustees as presently constituted in succession to their colonial predecessors. Section 2 begins by stating that “ The powers to acquire, hold, manage, lease, control, convey, grant and dispose of property both real and personal for the benefit of the residents and taxpayers of the Town of Huntington heretofore exercised by said Board of Trustees of the town of Huntington and/or its predecessors, are hereby ratified and confirmed in said Board of Trustees ”. (Italics supplied.)
Thus far the trustees are being confirmed in the powers expressly granted to their predecessors by the colonial patents, plus such as they and their predecessors have exercised by custom. Section 2 then continues: ‘ ‘ and said Board of Trustees is hereby authorized and empowered to continue to hold, manage, lease, convey, grant, invest and reinvest such property and funds as Trustee for the residents and taxpayers of the Town of Huntington ”. (Italics supplied.)
This language manifests that the powers described in the first clause are continued in the trustees to be exercised by them in the future, as well as confirmed with respect to the past. The last clause in section 2 empowers the board of trustees “ in furtherance of its said trust to acquire in its own name by gift, purchase or lease and to maintain and improve property of any nature either real or personal, for the benefit of the residents and taxpayers of the Town of Huntington.” (Italics supplied.)
It is difficult to believe that by the insertion of this last clause the Legislature intended to add to the powers which had theretofore customarily been exercised by the board of trustees. Such a construction would extend their proprietary capacity so as to include the exercise of important governmental powers over the affairs of the Town of Huntington. It would revert *248 to colonial days when the trustees not only held title to the common lands but also governed as a “ body corporate and politick ”. In their memorandum to the Legislature in support of this bill, which was submitted to the court upon the reargument, defendants (as board of trustees and town board) stated that the trustees had been stripped of all governmental powers. It is possible, of course, by a literal interpretation, taking the words out of context, to say that power to “ purchase or lease and to maintain and improve property of any nature either real or personal, for the benefit of the residents and taxpayers of the Town of Huntington ’ ’ would transfer to the trustees jurisdiction over all construction projects and the entire public works of the town. In this view it would include the acquisition of land for public highways, their construction and maintenance, the purchase and repair of road machinery, the construction of public buildings and the operation of the whole improvement district system functioning in towns under the jurisdiction of the town board and other public officials as provided by the Town Law. If this clause in section 2 confers authority to dredge for the improvement of navigation, it also includes authority to acquire and improve public highways.
In reality there was no such legislative intent. The power to [1] ‘ acquire ’ ’ applies only to such incidental lands or interests as may be necessary in order to protect the title or to supplement and thereby to realize the full value of the proprietary lands remaining in the trustees, whose only function is to conserve and sell them to the best advantage. The powers to ‘ ‘ improve ’ ’ and [1]‘ maintain ’ ’ the proprietary land are for the same objective. The correctness of this interpretation is shown by the language with which this clause commences, that these powers are conferred “ in furtherance of its said trust ”. The “ said trust ” refers to the proprietary function of these trustees as conservators and vendors of whatever remains of the colonial lands which were conveyed to their predecessors under these patents. Any other interpretation would be contradictory and incomprehensible. Literally, the power to acquire ‘ ‘ personal property * * * for the benefit of the residents and taxpayers of the Town of Huntington ” would include power to buy police cars or snowplows. Such an interpretation is precluded by the language limiting acquisition to such property as may be used “ in furtherance of its said trust ”. Personal *249 property to be acquired must be such as is necessary to conserve or to sell the proprietary lands. The same is true of any real property to be acquired or improved by the trustees — it must be incidental to the performance of their proprietary function and not involve the assumption of governmental power.
If further demonstration were necessary that the Legislature intended to confine the application of this statute to the proprietary capacity of these officials, it is found in section 4, which states that the Town Law, except as it otherwise specifically provides,[4] “ shall not apply to the acts of said Board of Trustees, and such acts shall be subject to review by the Supreme Court under the provisions of Article 79 of the Civil Practice Act of the State of New York. Such trust is hereby declared to be an express trust within the meaning of Section 1307 of the Civil Practice Act.” Manifestly it was not intended to render the Town Law inapplicable to the government of the Town of Huntington, or to restrict its application to any aspect of its affairs except the performance of the limited proprietary functions of these trustees. It would be inconceivable that the Legislature intended any part of the government of the town to be operated as an “ express trust ” subject to review by the Supreme Court. If such an object had been intended it would exceed the constitutional power of the Supreme Court, which is limited to the exercise of judicial power (N. Y. Const., art. VI, § 1; Matter of Richardson, 247 N. Y. 401). The Supreme Court would step out of its role if it were to participate in the administration of the public affairs of a town.
The main occasion for enacting chapter 816 of the Laws of 1952 appears to have been, as has been said, to quiet titles to real estate in the Town of Huntington. We were told upon the reargument that for the last 75 years the trustees have been accustomed to make grants of colonial lands without town meetings. In the early days the trustees took no action without town meeting authorization (cf. opinions by Chancellors Kent and Saxdeobd in Denton v. Jackson, 2 Johns. Ch. 320, and Town of North Hempstead v. Town of Hempstead, *250 1 Hopk. Ch. 288, affd. 2 Wend. 109, and likewise the opinion of this court in Lawrence v. Town of Hempstead, 155 N. Y. 297, 300). The Official Eeferee before whom the Centerport Beach action was tried said in his opinion that the trustees “ could do nothing without such authorization ”. This appears to have created uncertainty among title examiners concerning possible defects in titles to the numerous lots in Huntington which have been derived through trustee grants made during the major portion of the past century without having been authorized or approved by town meetings. Chapter 816 of the Laws of 1952 was designed to remove possible defects of this nature, by confirming the trustees in such powers relating to their proprietary functions as they (as well as their colonial predecessors) have exercised by custom. By enacting (§ 3) that “ All acts heretofore taken by said Board of Trustees in the exercise of the aforesaid powers are hereby legalized and confirmed and made effectual and valid as the official acts of said Board of Trustees ”, the Legislature clearly intended to confine any statutory ratification of past transactions to acts done by these town officials in their proprietary capacity as trustees.
The next inquiry is whether these dredging contracts and other public projects mentioned in the town proposition of May 15, 1951, were undertaken by the defendants in their proprietary capacity or as the town board. In the latter event, these acts were not affected by chapter 816 of the Laws of 1952. The name under which these officials assumed to act is immaterial. Where they have conducted matters pertaining to the government of the town in the name of the board of trustees, they are construed to have acted as the town board (Knapp v. Fasbender, supra). It was held in that case that the acquisition of land for the Centerport Beach project could only have been undertaken by them as the town board and did not pertain to their proprietary functions. This means that chapter 816 of the Laws of 1952 does not apply to the Centerport Beach project. The same is true of the acquisition of land for the various parking areas, baseball and other recreational fields in the town. The Appellate Division also held that the trustees could not appropriate funds from the dredging contracts for these purposes, which could only be done by the town board with the approval of the qualified electors, citing Mander v. Coleman (109 App. Div. 454) and Liffingwell v. Scutt *251 (221 App. Div. 462). The projects themselves, said the Appellate Division, “ could be done pursuant to section 64 of the Town Law [entitled “ General powers of town boards ”], only by the town board and then only upon approval of the qualified electors ”.
Although not applying to any of these other public projects under the ruling in Knapp v. Fasbender (supra), can it be held that chapter 816 of the Laws of 1952 applies to these dredging contracts? Under such decisions as Robins v. Ackerly (supra) and Sammis v. Town of Huntington (supra), it may be that the title to lands under water remains in the board of trustees, and they may have a proprietary right to sell deposits of submarine sand and gravel as they could grant the right to take oysters and would have title to structures erected on submerged lands; to this extent their title under the colonial grants may be involved. Nevertheless, the letting of contracts for the dredging of navigable waters would ordinarily be a transaction governmental in character and therefore beyond the proprietary capacity of the board of trustees. 11 The right of property in the soil or bed of a navigable river or arm of the sea, and the right to use the waters for the purposes of navigation, are entirely separate and distinct.” (People v. Vanderbilt, 26 N. Y. 287, 292.) These contracts for the dredging of Huntington Harbor and Bay pertain to the use of these waters for the purposes of navigation and appear, therefore, to have been made in the exercise of a governmental function (People v. Steeplechase Park Co., 218 N. Y. 459, 472 et seq.; People ex rel. Swan v. Doxsee, 136 App. Div. 400, affd. on opinion below 198 N. Y. 605), even though they also dispose of sand and gravel in the soil or bed of these waters.
A similar question was presented in Lewis Blue Point Oyster Cultivation Co. v. Briggs (198 N. Y. 287, affd. 229 U. S. 82). In that action the plaintiff had leased from the colonial patent holders lands under navigable waters of Great South Bay, and sought to enjoin invasion of their oyster beds by a dredging contractor operating at the instance of the United States Government. Speaking unanimously through Judge Vanít, this court said (pp. 292-293): “Is the grant of submerged soil, which is so directly connected with the public right of navigation as to be incapable of complete separation therefrom, subordinate thereto to the extent necessary to promote and *252 develop commerce? * * * For the same reason it is held that from grants of water land there is impliedly reserved the right of navigation, and, as a necessary part of so important a subject, the right to improve navigation for the benefit of commerce. * * * The patents in question are silent upon the subject of navigation in any phase. The crown did not grant any right that might interfere with navigation in its broad sense, because it could not, and the patents should be construed accordingly. * * * ‘ The implication springs from the title to the tideway, the nature of the subject of the grant and its relation to navigable tidewater, which has been aptly called the highway of the world. The common law recognizes navigation as an interest of paramount importance to the public. ’ ’ ’ The judgment of this court was affirmed by the Supreme Court of the United States in an opinion by Mr. Justice Lubton (229 U. S. 82).
The testimony upon the trial is to the effect that improvement of navigation was a primary object in letting these contracts, and it was so asserted in the memorandum which defendants submitted to the Legislature in support of this bill. It would therefore be reasonable to suppose that the dredging contracts were required by subdivision 6 of section 64 of the Town Law to be “ executed by the supervisor in the name of the town after approval by the town board ” subject to such referenda as might be required by law. Section 843 of the County Law recognizes this as a governmental function (renum. § 842 by L. 1951, ch. 652, § 24), by enacting that “ The board of supervisors of Suffolk county may provide for widening, deepening or dredging any bay, harbor, inlet or channel within its boundaries at the expense of the county and may appropriate moneys available for general town improvements in aid of federal or state projects for such purposes.” (Italics supplied.) This statute recognizes that the dredging of these waterways constitutes “ general town improvements ” overlapping the navigational functions of the county, State and nation, which signifies that dredging these waterways partakes of a governmental nature, so that, like highway improvement, it could be undertaken by the Board of Supervisors of the county as well as by the town.
This section of the County Law was the subject of a taxpayers’ action decided in this court in 1933 (Macrum v. Hawkins, *253 261 N. Y. 193), wherein the plaintiffs asked to enjoin the Board of Supervisors of Suffolk County from issuing $1,000,000 in dredging bonds, $500,000 of which was for expenditure in the Town of Huntington, including the dredging of Huntington Harbor. The record therein contains a report of the Suffolk County Regional Planning Board which states that the United States Government had dredged and was maintaining a channel 100 feet wide by 8 feet deep in Huntington Harbor (Record, p. 85).
In their capacity as trustees, defendants may have had a right to sell the deposits beneath these navigable waters without a curative statute, and in their capacity as town board subject to referendum to make contracts for the improvement of navigation in Huntington’s harbors and bays as in the case of highways. But no more than in the case of highways does this statute reach whatever they may have done in the exercise of their functions as town board. The trustees had no power over navigation, and could not act for the Town of Huntington in the improvement of navigation.
We are unable to agree with the majority opinion that the public right of navigation may not be directly involved. It was not within the province of the trustees to decide, for example, where a channel should be located or to what depths it should be dredged. These dredging contracts contain a map showing the areas and prescribing that the depth shall not be less than 10 feet nor more than 30 feet below the mean low water level. It is difficult to understand how specifying the depth and location of a channel did not involve navigation, and if these specifications were prescribed by the trustees, they would appear to have exceeded their powers. These contracts provide that if the dredging corporation uncovers rock or other obstruction too costly to remove, these shall be marked ‘ ‘ by buoy or otherwise, as to insure safety to navigation during its dredging operations ” and the dredging corporation “ agrees at its own cost and expense to procure all permits necessary from the Federal Government or other governmental authorities having jurisdiction, and shall comply with all rules and regulations of such governmental authorities and when the dredging is completed shall leave the dredged areas in such condition as may be required by such governmental authorities.” The United States Statutes At Large show that eight times *254 between 1890 and 1913 appropriations were made by the Congress for the improvement or maintenance of “ Harbor at Huntington, New York ” and for the construction there of a lighthouse.[5] In 1938 it was again adopted as a Federal project.
In the brief of the Suffolk County Board of Supervisors in Macrum v. Hawkins (supra) after reciting the proprietary ownership under colonial patents by the trustees of lands under water, the statement is made:
“ Such ownership is, however, subject to the right of the sovereign to enter upon the land under water for the improvement of navigation and such right may be exercised by the State or the Federal Governments without regard to the rights of those using the bottom for shell fishing or other purposes (Lewis Blue Point Oyster Co. v. Briggs, 198 N. Y. 287, aff'd 229 U. S. 82).
“ By the Act, Chapter 401, Laws 1931, the State has delegated its sovereign power in this respect pro tanto. Such delegation was proper (Walla Walla v. Walla Walla Water Co., 172 U. S. 1). In that case, the Court said (p. 9): ‘ State legislatures may not only exercise their sovereignty directly, but may delegate such portions of it to inferior legislative bodies as, in their judgment, is desirable for local purposes. ’
*255 11 The State acts through the agency of the municipal corporation, though, here, before work can be done, the consent of the IT. S. Chief of Engineers and of the War Department must be obtained (U. S. Eiver and Harbor Act of March 3,1899, 30 U. S. Stat. 1151, Chap. 425, Sec. 10).” (Now U. S. Code, tit. 33, § 565.)
These repeated appropriations and improvements made by the Federal Government in the case of this same waterway indicate that navigation is involved, and that regardless of whether dredging is undertaken by the Federal Government, State, County or Town, the nature of the function is the same. In People ex rel. Palmer v. Travis (223 N. Y. 150, 163), this court stated that under similar colonial grants: 1‘ The most the town could claim, therefore, was title subject to the public right of navigation and commerce. (Lewis B. P. Oyster C. Co. v. Briggs, 198 N. Y. 287.) It could claim no more, for the sovereign could not grant more. His rights to such land and to tidal waters was twofold — proprietary as to the land, governmental as to the waters. (Matter of Mayor, etc., of N. Y., 182 N. Y. 361.)”
It was the function of the town board or some other governmental body and not that of the trustees to decide whether improvements to navigation were necessary or should be undertaken and to decide what should be done and what it should cost or would be worth. Although it is assumed that they were empowered to sell underwater deposits, they could not agree to accept as part of the consideration benefits which the town might derive from the improvement of navigation. It was not the trustees7 function to spend assets of the town for that purpose. The proceeds of the sale of sand or gravel or of other proprietary assets belonged to the town, and could not be spent or appropriated by the trustees except in such minor amounts as might be necessary to conserve the proprietary lands. They could not appropriate these funds for other projects.
One of the reasons on account of which it seems to us that the application of chapter 816 of the Laws of 1952 should not be decided in this action is that the issue was not tried of the extent to which navigation is involved in these dredging contracts. It is certain that they are related to navigation. Upon the other hand, the trustees appear to have had the power to sell underwater deposits of sand and gravel for their full value (as determined in the best judgment of the trustees acting in *256 good faith), without deduction for any benefits arising from the improvement of navigation. In that event, the trustees might sell the right to take sand and gravel as they could sell the right to take oysters, provided that it did not interfere with the public rights of navigation. In that view, these would not be dredging contracts but exclusively contracts for the sale of submarine deposits, and all that was represented to the courts and to the Legislature about the valuable benefits arising from the deepening of Huntington Harbor would be irrelevant to the issue. One assumes from this record that the trustees sold these deposits beneath the waters of the harbor and bay for less than would otherwise have been received due to the benefits which they considered that they were conferring upon the Town of Huntington by improving the navigability of these waters. The effect of such a procedure would be the same as though the trustees had undertaken to spend money belonging to the town to improve navigation. How much that part of the consideration was worth, or whether the town’s assets should have been spent for that purpose at all, was not in the province of the trustees to decide, but in that of the town board or the County Board of Supervisors, subject to such referendum as might be required by law. A trial might disclose that the trustees, in their .best judgment, contracted at full value for the sale of the underwater deposits, and that these were not really dredging contracts. We should not assume that such is the fact without a trial of this issue. If in signing these contracts the defendants acted in their capacities both as trustees and as the town board, chapter 816 of the Laws of 1952 would not apply to so much of the transactions as fell within the functions of the town board. Under such a state of facts, this statute would not ratify or confirm the power to enter into these transactions. That would be the situation if a trial proved that part of the consideration for these contracts was deepening Huntington Harbor and Bay. A determination of that question should be reserved for the Hubscher action in the light of all of the facts bearing upon that issue; it should not be decided upon this record upon inadequate evidence taken for a different purpose.
The object of this statute could not have been to ratify every act which the trustees may have assumed to perform in excess of their proprietary powers since the American Revolution. Their proprietary functions as established by custom were *257 protected against encroachment from the Town Law, hut this does not signify that town officials are not to be elected, taxes raised, public money appropriated, lands acquired, contracts for public improvements let and other functions of government performed under the usual statutes. Neither does it mean that by acting in the name of trustees, town officials can be freed from the fiscal controls that are imposed upon them by law as town officials.
If chapter 816 of the Laws of 1952 did attempt to settle these litigations, validate the dredging contracts as well as other public projects mentioned in the town proposition of May 15, 1951, and all acts which the trustees may have assumed to perform in excess of their authority during the course of a century and three quarters, and also to enlarge the trustees’ powers to enable them to undertake public works without being subject to the Town Law or other relevant statutes, it would be clearly unconstitutional. If it were to be construed in that manner, which its language indicates that the Legislature did not intend, it would not only comprise more than one subject, due to the same circumstances previously stated on account of which the town proposition of May 15, 1951 embraces more than one subject, but would also be more vulnerable to that infirmity in that it would purport to validate every usurpation of governmental power by the board of trustees since the colonial era. If, in addition to its other purposes, it sets up a new form of government in the Town of Huntington, by extending the power of the board of trustees to include public works, it would hardly be necessary to cite the case of Parfitt v. Furguson (159 N. Y. 111, 116) to establish that it is unconstitutional, where this court said: “ The establishing of a board of improvement for the town, and defining its powers and duties with reference to the lighting of the streets in the town, is one subject; that of ratifying and confirming illegal contracts is quite another subject.” (See, also, Wenk v. City of New York, 82 App. Div. 584.)
The removal of the ordinary financial controls over important aspects of town affairs is a subject by itself, which cannot be linked with the Centerport Beach project, dredging projects or any of the other undertakings which this statute could not constitutionally be stretched to cover (Matter of McCabe v. Voorhis, 243 N. Y. 401).
*258 The judgment appealed from should be reversed and the proposition passed at the Huntington town meeting on May 15, 1951, should be declared to be invalid. If chapter 816 of the Laws of 1952 becomes the subject of any ruling, it should be held not to apply to any of the projects mentioned in that town proposition, and, if it be held to have been designed to ratify them, should be determined to be unconstitutional.
Desmond, Dye and Fuld, JJ., concur with Burke, J.; Van Voorhis, J., dissents in an opinion in which Conway, Ch. J., and Froessel, J., concur.
Judgment affirmed.

. The need for this, and for voting separately on all town appropriations which this proposition is in part, is stated again in section 106 of the Election Law: “All ballots for the submission of town propositions for raising or appropriating money for town purposes, or for incurring a town liability, to be voted at any town meeting in any town, shall be separate from all other ballots for the submission of other propositions or questions to the voters of such town to be voted at the same town meeting or election. Such ballots shall be endorsed ‘ballot upon town appropriations’.”

. “ Air act to ratify and confirm the title of the trustees of the town of Huntington, Suffolk county, in and to certain lands therein and to ratify and confirm the acts of its board of trustees, and defining the powers and duties of such hoard. * ~ *
“ Section 1. Legal title is hereby ratified and confirmed in the Board of Trustees of the Town of Huntington as successor to the Trustees of the Freeholders and Commonalty of the Town of Huntington under Chapter 492 of the laws of 1872 as amended by Chapter 101 of the Laws of 1929, to all lands described in the Governor Nicholls Patent recorded in Book No. 1 of Patents at Page 73, in the Governor Dongan Patent recorded in Book No. 6 of Patents at Page 338 and in the Governor Fletcher Patent recorded in Book No. 6 of Patents at Page 493, all in the office of the Secretary of State.
“ § 2. The powers to acquire, hold, manage, lease, control, convey, grant and dispose of property both real and personal for the benefit of the residents and taxpayers of the Town of Huntington heretofore exercised by said Board of Trustees of the town of Huntington and/or its predecessors, are hereby ratified and confirmed in said Board of Trustees and said Board of Trustees is hereby authorized and empowered to continue to hold, manage, lease, convey, grant, invest and reinvest such property and funds as Trustee for the residents and taxpayers of the Town of Huntington, and in furtherance of its said trust to acquire in its own name by gift, purchase or lease and to maintain and improve property of any nature either real or personal, for the benefit of the residents and taxpayers of the Town of Huntington.
“ § 3. All acts heretofore taken by said Board of Trustees in the exercise of the aforesaid powers are hereby legalized and confirmed and made effectual and valid as the official acts of said Board of Trustees.
“ § 4. Except as therein otherwise specifically provided, the provisions of the town law, shall not apply to the acts of said Board of Trustees, and such acts shall be subject to review by the Supreme Court under the provisions of Article 79 of the Civil Practice Act of the State of New York. Such trust is hereby declared to be an express trust within the meaning of Section 1307 of the Civil Practice Act.
“ § 5. If any clause, sentence, paragraph or part of this enactment or the application thereof to any person or circumstances, shall for any reason be adjudged by a court of competent jurisdiction to be invalid, such judgment shall not affect, impair or invalidate the remainder, and the application thereof to other persons or circumstances, but shall be confined in its operation to the clause, sentence, paragraph or part thereof directly involved in the controversy in which such judgment shall have been rendered, and to the person or circumstances involved. It is hereby declared to be the legislative intent that this enactment would have been adopted had such invalid provisions not been , included therein.
“ § 6. This act shall take effect immediately.”

. The only specific mention made of the trustees in the Town Law is said to be in subdivision 1 of section 64 empowering the town board to designate a bank as depository for funds of the trustees, and paragraph (b) of subdivision 18 of section 130 empowering the town, on application of the trustees, to adopt ordinances regulating the taking of shell fish from proprietary land.

. 26 IT. S. Stat. 430, ch. 907 (1890): Improving harbor at Huntington, Long Island, New York, $10,000; 32 U. S. Stat. 334, ch. 1079 (1902): Improving harbors at Port Jefferson, Huntington * * *: Continuing improvement and for maintenance, $39,500; 33 IT. S. Stat. 1120, ch. 1482 (1905): Improving harbors at Port Jefferson * • * Huntington * * *: Continuing improvement and for maintenance, $62,500; 34 IT. S. Stat. 1077, eh. 2059 (1907): Port Jefferson * * * Huntington * * *: Continuing improvement and maintenance, $125,000; 34 U. S. Stat. 995, eh. 1638 (1907): “A .light and fog signal station at the entrance of Huntington Harbor and Lloyd Harbor, New York at a cost not to exceed forty thousand dollars ”; 35 IT. S. Stat. 829, ch. 264 (1909): Preliminary examination of harbor to be made; 36 U. S. Stat. 635, ch. 382 (1910): Improving harbors at Port Jefferson * * * Huntington * * *: Continuing improvement and for maintenance, $40,750; 37 U. S. Stat. 803, eh. 144 (1913): Improving harbor at Huntington, New York and maintenance, $5,000; 42 U. S. Stat. 1043, ch. 427 (1922): Preliminary examination, etc., of Huntington Harbor, New York, to be made by Secretary of War; 46 IT. S. Stat. 934, ch. 847 (1930): Huntington, New York; preliminary examination and survey directed to be made by Secretary of War: Huntington Harbor, New York; 52 IT. S. Stat. 803, ch. 535 (1938): Huntington Harbor, New York; House Doe. 638, 75th Congress: “Be it enacted * * * That the following works of improvement of rivers, harbors, and other waterways are hereby adopted and authorized, to be prosecuted under the direction of the Secretary of War and the supervision of the Chief of Engineers ”.